9 N.J. Super. 195 (1950)
75 A.2d 735
GARRISON C. FOSTER, INDIVIDUALLY, AND GARRISON C. FOSTER, ADMINISTRATOR OF THE ESTATE OF MARY FOSTER, DECEASED, PLAINTIFFS-APPELLANTS,
v.
THEODORE R. MEDELA AND MARIANA C. MEDELA, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued August 28, 1950.
Decided October 2, 1950.
*198 Before Judges JACOBS, BIGELOW and WM. J. BRENNAN, JR.
Mr. Walter S. Keown argued the cause for plaintiff-appellant.
Mr. James M. Davis argued the cause for defendants-respondents (Mr. Howard J. Stackhouse, attorney).
The opinion of the court was delivered by BRENNAN, WM. J., JR., J.A.D.
The final judgment before us was entered by Judge Rogers of the Chancery Division on conclusions of the late Vice-Chancellor Woodruff filed after final hearing before the latter on an amended and supplemental bill of complaint in the former Court of Chancery.
When Garrison C. Foster in 1926 sold his 40-acre farm in Evesham Township, Burlington County, to the defendants, his daughter and son-in-law, the entire consideration was a $4,000 purchase money mortgage taken in the names of himself and his wife, Mary Foster. His wife died in October, 1935. The mortgage was cancelled of record February 11, 1943. He was named administrator of his wife's estate on May 11, 1945. On September 28, 1945, he, individually and as administrator, filed his amended and supplemental bill of complaint to set aside the cancellation of the mortgage alleging that it was effected by the fraud of defendants upon him for a grossly inadequate consideration and stripped him of *199 virtually all his assets at a time when he was almost 86 years of age and under the influence of and dependent upon defendants, and was without independent advice.
The Vice-Chancellor found that the cancellation was valid as to the individual one-half interest of the plaintiff, which finding plaintiff appeals, but ineffective as to Mary Foster's one-half interest because the plaintiff at the time of the cancellation was not clothed with any authority to bind her estate.

I.
Defendants had lived rent free on the farm for several years before plaintiff sold it to them in 1926. They ran the place as a poultry farm. They contracted a feed bill to Kirby Brothers, feed merchants, which by 1931 amounted to almost $4,000 and by 1943 had been reduced only to $3,100. Kirby Brothers held their notes for this debt, which notes and their renewals, the plaintiff, starting apparently in 1931 and continuing to 1942, endorsed for defendants' accommodation. On October 14, 1931, plaintiff and his wife assigned the $4,000 mortgage to Burlington County National Bank in Medford, nominee for Kirby Brothers, as security for the notes and plaintiff's obligation as endorser thereon. The original mortgage was delivered to the bank at that time, but for some reason not revealed by the record plaintiff retained the bond.
Plaintiff came to the farm to live with defendants shortly after his wife's death in 1935 and remained there until he left in the spring of 1944. This was the period of his 76th to 87th years. He apparently enjoyed good health, drove his own car and except for odd jobs about the place devoted his time to his own pursuits and came and went as he pleased and on his own. The relationship appears to have been amicable; at least there is no evidence of unpleasantness or strain until the happening of the events which gave rise to this suit.
Plaintiff was obviously fond of both his daughter and his son-in-law. "I have always helped them out ever since I've *200 been there. Everything I could do I always done for them." He apparently had no independent means of much value while he lived with them. He owned and still had at the time of final hearing a few acres of unimproved land of little worth, and at some time, not clearly specified, had realized a substantial sum from the sale of another farm. He testified that this money had been spent several years before 1943; this is probably true because his daughter testified that while he lived with them she and her husband gave him not only a home but also bought his clothes and supplied him with small sums he required for spending money.
Late in 1942 defendants decided to rebuild a burned-down brooder house. The daughter testified that she approached her father and told him of this and told him further that she and her husband wanted first "to have a settlement on the place," because they did not want to increase their investment in the farm while both the mortgage and the Kirby Brothers debt were outstanding. She told him she had $500 of her own and that, while she felt she owed him nothing after the years she had supported him, she would give him that sum if he would cancel the mortgage. She said plaintiff told her he would think it over and about ten days later came to her and said "Let's go up and make the settlement. I decided it would be all right."
Plaintiff's version is quite different. He testified that the defendants asked him for a "loan" of the mortgage so that they could use it to raise money to "fix up the chicken houses" and that they would give him $500 and return the mortgage when the Kirby Brothers bill was paid. Apparently he forgot that the mortgage had been delivered to the bank twelve years earlier and thought that the bond which he had retained was the mortgage. In any event he insisted that nothing was ever said to him by anyone about cancellation of the mortgage and that he first learned it had been cancelled after he quit the farm in 1944.
What happened was that on February 1, 1943, plaintiff and defendants met at the bank with its cashier and one of the *201 Kirby brothers. At that meeting the original mortgage in the bank's hands was endorsed by its officers for cancellation and a new mortgage for $3,100, the then balance of defendants' debt, was given by defendants to Kirby Brothers to secure their note for that amount, which note, in this instance, was not endorsed by plaintiff. At the same time the plaintiff was paid $500 in cash by his son-in-law. Plaintiff did not have the bond with him at the bank and about ten days or two weeks later, at the farm, he gave it to his son-in-law after signing his name under an endorsement "Paid in full" written thereon by the son-in-law.
The Vice-Chancellor thought and we agree that no actual fraud or undue influence was proved. Plaintiff's insistence that he was unaware that the mortgage was cancelled, that he was told nothing about it and did not understand what went on at the bank while he was there is difficult to credit. What caused him to leave the farm was that the defendants paid off the Kirby mortgage within a year and did not tell him about it. He learned of it only when about two months after the event he chanced to overhear a conversation between the son-in-law and a friend of the latter. He obviously was deeply hurt and gathering up his belongings and farm tools he quit the farm and moved to the home of one of his sons.
However, there was no proof that plaintiff had independent advice nor did defendants offer any explanation why they hid the fact of the payment of the Kirby debt from the plaintiff or where they had acquired the means to make the payment. We disagree with the Vice-Chancellor's finding that no dominant confidential relation obtained between plaintiff and defendants. We think such a relation was established calling for the application of the principle that when a person is under the influence of and dependent upon others and enters into an improvident transaction with them stripping himself of virtually all his assets, a presumption of undue influence arises from the facts casting upon the dominant partners the burden to show by clear and convincing proof *202 that the transaction was the voluntary and intelligent act of the dependent person made with the benefit of competent and disinterested counsel and fully understood and intended. Slack v. Rees, 66 N.J. Eq. 447 (E. & A. 1903); Seylaz v. Bennett, 5 N.J. 168 (1950); Croker v. Clegg, 123 N.J. Eq. 332 (E. & A. 1938); Alberts v. Alberts, 119 N.J. Eq. 391 (E. & A. 1935); Pearce v. Stines, 79 N.J. Eq. 51 (Ch. 1911); Christian v. Canfield, 108 N.J. Eq. 547 (Ch. 1931); In re Fulper's Estate, 99 N.J. Eq. 293 (Prerog. 1926).
Plaintiff met the burden upon him to show a confidential relation between him and defendants with dependency in the plaintiff. The relationship understandably is "difficult of exact definition." In re Fulper's Estate, supra. Its essentials are a reposed confidence and the dominant and controlling position of the beneficiaries of the transaction. Chandler v. Hardgrove, 124 N.J. Eq. 516 (Ch. 1938). Plaintiff was probably the dominant partner in the early stages when he so generously made it possible for defendants to get established on the farm. The roles were reversed at some point after he came to live with the defendants as the old gentleman's advancing years made him more and more dependent upon defendants for all his creature comforts. The reliance and trust which originated in his affection for them increased as his old age made their reciprocal affection not merely his due but his necessity. True, his years on the farm are not shown to have been lonely and happily he was not "beset by the physical weakness and illness and lack of mental vigor which are its usual accompaniments." Croker v. Clegg, supra. His dependency, nevertheless, is obvious and that trust and confidence was reposed by him in the defendants is very clear. What he had always unselfishly done when younger and held the purse strings, he was now, as well, under the compulsion of his dependency to continue.
It is manifest that he quit the farm in the manner he did without any explanation to defendants or demand of any kind upon them because of the deep hurt he felt in having his trust betrayed. The defendants had somehow found the means in *203 less than a year to pay off the Kirby debt after having induced him to cancel the mortgage by their representations of their inability to pay him. This suddenly found prosperity of the defendants is a circumstance which beclouds the whole transaction. Their complete silence about and failure to share with their generous benefactor the good news that after two decades they had freed themselves of the debt is evidence justifying his feeling that he had been tricked and cheated. Certainly their relation to him called upon them to make some explanation and cast upon them the burden of proving the fairness of the transaction and of showing that he had had independent advice and had fully understood the consequences of what he did.
Nor does the fact that he received $500 and was relieved of further obligation as endorser of defendants' notes validate the cancellation. If the transaction was unfair and tainted with fraud or undue influence, and we have said it was defendant's burden to show the contrary, the fact that it was based upon some but inadequate consideration does not save it. In re Fulper's Estate, supra. The defendants argue that the transaction actually improved rather than impaired his position because the whole of his interest might at any time have been wiped out by foreclosure of the pledge by Kirby Brothers. The premise is faulty. There is no credible proof that Kirby Brothers contemplated such action or, indeed, that they were pressing defendants for payment of their bill. However, if Kirby had demanded payment, it now appears very probable that defendants had funds with which the payment could have been made which certainly was their obligation if the mortgage would thereby be relieved of the lien of the Kirby claim.
The judgment as to plaintiff individually is reversed. Plaintiff, however, is not entitled to interest on that share from the date the mortgage was given in 1926. He never demanded interest of the defendants. This was in keeping with his whole attitude toward and desire to help defendants. More important, however, it appears that both parties thought *204 that while plaintiff lived on the farm the interest obligation was offset by what plaintiff received from defendants by way of support and spending money. Interest will therefore be allowed only from the time he quit the farm in 1944.
The trial court is directed to enter a judgment in substantially the form of the judgment entered in favor of the estate of Mary Foster but in the amount of $1,500 (balance of principal after crediting the $500 paid to plaintiff on February 1, 1943) with interest from April 1, 1944.

II.
Defendants filed but abandoned, except in a particular now to be discussed, an appeal from that part of the judgment invalidating the cancellation as to Mary Foster. The single question they raise is whether they are entitled to prove credits of $317, with interest, against the judgment for $2,000 and interest entered in favor of the estate.
There is some scant evidence in the record of payments to Mary Foster in her lifetime but they are not specially related to the mortgage, either principal or interest. The matter of credits was not dealt with in the Vice-Chancellor's conclusions and we may properly infer that this is because the defendants had not proved that they were entitled to credits. The basis of their present appeal is that after the final hearing they discovered new evidence in the form of a book recording in plaintiff's handwriting some payments by defendants to Mary Foster from 1933 to the time of her death. It appears that defendants did not formally apply for a rehearing before entry of the final judgment; counsel for defendants contented himself with a reference to the matter in an informal colloquy with Judge Rogers out of the presence of and without notice to plaintiff or his counsel. Moreover, defendants after the entry of the judgment did not during the periods limited by Rules 3:59 and 3:60-2 apply to the trial court for a new trial on the issue of credits based on the newly discovered evidence. They acknowledge, as they *205 should, that the better practice would have been to apply to the trial court. However, they urge that we consider their appeal, which was filed two months after the entry of the judgment, as in the nature of an application for a new trial and that, exercising original jurisdiction under Rules 1:4-10 and 4:4-7, we return the case to the trial court with directions to take an accounting of the amount due the Mary Foster estate. Their difficulty is that they have not shown a case for that relief. New evidence does not entitle a party to a new trial if it is merely cumulative of evidence produced at the trial. State v. Bunk, 4 N.J. 482 (1950); State v. Hunter, 4 N.J. Super. 531 (App. Div. 1949). The supposed new evidence, like that offered at the trial, is simply of payments generally and not of payments made on account of either principal or interest due on the mortgage.
The judgment as to the Mary Foster estate is affirmed.