12 N.J. Super. 217 (1951)
79 A.2d 492
IN THE MATTER OF THE PROBATE OF THE ALLEGED CODICIL OF MARY V. STROMING, DECEASED.
GILBERT STROMING, ONE OF THE NEXT OF KIN, ETC., CAVEATOR-APPELLANT,
v.
RUSSELL E. STROMING, AS EXECUTOR, & C., OF MARY V. STROMING, DECEASED, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 12, 1951.
Decided March 5, 1951.
*219 Before Judges McGEEHAN, JAYNE and WM. J. BRENNAN, JR.
Mr. Aaron Heller argued the cause for appellant (Messrs. Heller & Laiks, attorneys; Mr. Irving Lloyd Gang on the brief).
Mr. Donald G. Collester argued the cause for respondent (Messrs. Collester & Johnson, attorneys).
The opinion of the court was delivered by WILLIAM J. BRENNAN, JR., J.A.D.
Appellant, Gilbert Stroming, filed a caveat against the probate of a codicil to the will of his mother. Mary V. Stroming. The Passaic County Court, Probate Division, after hearing, entered judgment on *220 July 12, 1950, admitting the codicil to probate, and Gilbert appeals.
Appellant's brief argues that the trial judge "developed a prejudice against the caveator" which "of necessity influenced his subsequent rulings to the detriment of the contestant," that this hostility was "perhaps precipitated by argument of (caveator's) counsel, who sought to preserve and protect the interests of a client" and, further, "It required more than a perfectly controlled temper on the part of trial counsel to cope with the actions, arguments, criticisms and dictates of the trial court, especially where it was felt that there was no reason or provocation for such conduct." The charge is based upon a number of sharp exchanges with counsel concerned with rulings upon objections to questions put to witnesses by appellant's counsel and upon the vigor and nature of the examination of appellant made by the trial judge. Many of the exchanges with counsel and the court's examination of appellant display the use by the judge of a regrettable acerbity of language and an impatience of attitude toward the appellant which should have been avoided despite their provocation in many instances by the unwarranted persistence of appellant's counsel in pressing his position after adverse rulings. "It must be borne in mind that, in the effectual maintenance of a strong and independent court system, the appearance as well as the actuality of fair and impartial judicial administration must at all times be sought." State v. Illario, 10 N.J. Super. 475 (App. Div. 1950). The judge and counsel, as officers of the court, share the responsibility for the faithful and meticulous performance of this high duty.
We have, in the circumstances, exercised our discretionary power under Rule 1:2-20 (see Rules 4:2-6 and 3:81-13) and have made an independent finding of the facts. We are satisfied that the codicil was properly admitted to probate. We perceive no prejudicial error in the rulings on questions of evidence. Counsel for appellant conceded at the oral argument that the record included all evidence he sought to adduce except that he argues he was not permitted sufficiently to develop, particularly on cross-examination of witnesses, evidence *221 of "suspicious circumstances" which he contends are inferable from the choice of witnesses to the codicil, the difference in value between his client's inheritance and that of the beneficiary under the codicil and the bequest to that beneficiary not only of certain notes but also of all other obligations due to testatrix from Goodyear Sundries & Mechanical Co., Inc. The trial judge might well have allowed greater latitude of examination on these subjects. No prejudicial error was committed, however, inasmuch as it is plain to us that, in this case, the fullest development of these circumstances would not have supplied the requisite proofs to sustain the caveator's claim.
Mary V. Stroming died January 27, 1950, at the age of 58, survived by Gilbert and another son, the defendant executor, Russel F. Stroming. Her husband and the sons' father, Frederick, died in January, 1940. He had operated the corporate business of Goodyear Sundries & Mechanical Co., Inc., in New York City. After his death his widow acquired 51 per cent of the capital stock of the company and Russel acquired the remaining 49 per cent. Mrs. Stroming, as president, and Russel, as secretary, thereupon undertook the active management of the business. They prospered from 1942 to 1948 sufficiently to receive salaries of $300 per week each. When business fell off, Russel and his mother both advanced sums for working capital which were recorded on the company's books as loans and which at the end of 1948 amounted to $5,250 as to each. Mrs. Stroming's salary was reduced to $200 per week and remained at that figure until her death. Russel's salary was reduced also, but not so much, and the reduction was substantially restored when his mother's illness forced her to stop work in April, 1949, and Russel assumed the full burden of running the business.
In January, 1949, the business was in need of more assistance and Mrs. Stroming advanced $10,000 for which she received 32 company notes in the amount of $300 each and one note for $400. Russel had just bought a home and could not contribute to the financing. None of the notes was paid before testatrix' death.
*222 On November 18, 1946, Mrs. Stroming executed a will, drawn by Mr. Kalfus, a New York attorney who was and for ten years had been counsel for the company and was then in private practice. Two months later, in January, 1947, the attorney withdrew from private practice and joined the company as a vice-president.
The will bequeathed Mrs. Stroming's 51 per cent stock interest in the company to Russel, and gave the residue of her estate to Gilbert.
Consistent with her testamentary plan, testatrix made gifts to Gilbert of $9,000 in 1947 when he purchased his home, and $12,000 on or about October 25, 1949, when she sold her residence. In April, 1949, before being hospitalized for a second operation for a cancerous condition, she entrusted the company notes to Gilbert. He does not claim that she intended to make a gift to him of the notes at the time but only that he understood they were to be his upon her death as part of what he was to receive under her will.
In October, 1949, about the time of the $12,000 gift to Gilbert, Russel was required to advance $3,500 to the business. He told his mother about it and she offered to advance a like amount to keep their positions "equal." Russel suggested that she cancel $3,500 of the notes instead. She asked Gilbert to return the notes and he refused. Gilbert denies that this happened, but we do not credit his denial. Mrs. Stroming not only told Russel about it but she also told her sister, Mrs. Chesebrough, and her attorney, Mr. Kalfus. Testatrix was concerned about Gilbert's attitude because she feared he might "make trouble" for Russel. On November 22, 1949, Mr. Kalfus paid her a social call when he had occasion to be in New Jersey on company business. She asked his advice. He assured her Gilbert could do nothing with the notes as they had not been endorsed and that the notes in any event would probably be paid off in her lifetime as business improved. She told him "* * * the business as it was on November 22nd was not the business it was when she drew her original will, that in the meantime she had given plenty of money, she told me, to Gilbert. She told me she had sold her house not long before, *223 that she wanted her sons to have the money while she was alive, and she told me that any money due to her from the corporation was really part of the corporate business and she wanted that part to go to Russel and the other things she had to go to Gilbert." Mr. Kalfus advised her that this could be accomplished by the making of a codicil to her will leaving Russel any balance owing her by the company at her death. She instructed him to prepare such a codicil and he did so that afternoon and it was executed that night. It bequeathed to Russel, in addition to her stock in the company, "all claims which I may have at the time of my decease against the said Goodyear Sundries & Mechanical Co., Inc., or monies loaned, or otherwise, and represented by promissory notes or open accounts."
Testatrix enjoined Russel and Russel's wife, Elinor, to whom she gave the executed codicil for safekeeping, Mr. Kalfus and her sister, Mrs. Chesebrough, to say nothing about the codicil. Gilbert never learned of its existence until after his mother's death when he and Russel went to the Passaic County Surrogate's office to probate the will and Russel produced the codicil.
Gilbert has abandoned the contentions made below that his mother lacked testamentary capacity when the codicil was executed and that he affirmatively proved that Russel had actually exercised undue influence upon their mother to execute the codicil. His sole reliance on the appeal is upon the argument that the proofs established the existence of a confidential relation between Russel and his mother, throwing upon Russel the burden of proof to show the absence of such influence, which burden, Gilbert argues, Russel did not meet.
Normally the person asserting undue influence has the burden to prove clearly its existence, that is, in this case, convincingly to show that the testatrix' "free agency" was destroyed by the exercise of improper influence constraining her to do what she otherwise would not have done in modifying the disposition made by her will. See In re Gotchel, 10 N.J. Super. 208 (App. Div. 1950); In re Neuman, 133 N.J. Eq. 532 (E. & A. 1943). The beneficiary, however, has the burden *224 to show the absence of undue influence where the person charging it proves the existence of a confidential relation between the beneficiary and the testatrix and also proves at least "slight circumstances" or indicia of undue influence exercised upon the decedent. Gellert v. Livingston, 5 N.J. 65, at 71 (1950).
There are innumerable cases involving confidential relationship, but the courts have not been able precisely to define what it is. See Foster v. Medela, 9 N.J. Super. 195 (App. Div. 1950); In re Fulper, 99 N.J. Eq. 293 (Prerog. 1926). A confidential relation is not confined to any specific association of the parties; "Its essentials are a reposed confidence and the dominant and controlling position of the beneficiary of the transaction." Foster v. Medela, supra. "It is clear that the dominance must be of the mind, and the dependence must be upon the mind rather than upon the hands and feet of the donee." Chandler v. Hardgrove, 124 N.J. Eq. 516 (Ch. 1938). It exists when the circumstances make it certain that the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed. It does not exist where the parties deal on terms of equality, although, as here, they are at the same time mother and son and business associates. See Croker v. Clegg, 123 N.J. Eq. 332 (E. & A. 1938).
The testatrix was undoubtedly very ill at the time the codicil was executed. She did not, however, know how ill she was, because on the advice of her physician her family faithfully kept the truth from her. They encouraged her in her belief that she had jaundice and that recovery would be slow but nevertheless certain. Her first operation was performed in March, 1948, and following her convalescence she returned to work, traveling from Passaic to New York and spending at least four full days each week at the office until April, 1949. After her second operation she sold her home and lived with Gilbert and his wife about six weeks and then took her own apartment in Barry Gardens, Passaic, in early November, 1949, and lived there alone, attended only during the day by *225 a nurse until the middle of December when a night nurse was also employed. She had visitors every day, usually her sons and their wives and her sisters, but others also. As late as January 11, 1950, her birthday, she had a party of a dozen or more of her lady relatives and friends. Her family knew that her death was inevitable, but until two weeks before her death when she lapsed into a coma there was no sign of its imminence. She was "gay," "always a happy go lucky disposition," "her mind was keen," "never incoherent," "always normal."
Appellant makes a particular point that she was constantly taking drugs to relieve her pain, but his argument that she was in a state of continuing narcosis is not supported in the evidence. Her doctor prescribed sedatives to be taken at times of her choice and these, he said, when taken "kept her quiet, drowsy and sleeping part of the time," but otherwise she was "wide awake" and "she certainly didn't lose her mental faculties but they certainly were lessened," "she talked sensibly." She managed her household affairs, paid her own bills, and manifested throughout a determination to maintain her own independence.
Gilbert saw his mother almost daily both before and after the codicil was executed. There was no evidence of any attempt to exclude him from his mother's society. As late as Christmas Day Gilbert's wife, Irene, had a conversation with testatrix about the disposition of her property. Irene testified that testatrix told her again what she had previously said on occasions in October and November, that she meant Russel to have the business as his own, "he had worked hard for it," and since Irene and Russel's wife, Elinor, "weren't exactly on friendly terms, she thought it would be better if she left Russel the business and my husband (Gilbert) the residue of her estate. She mentioned that to me several times."
The essentials of a confidential relationship in the specific sense which makes applicable the doctrine relied on by appellant do not appear. Further, we are not persuaded that Russel was, as appellant suggests, the author of the plan to have his mother execute the codicil. Testatrix had made known her worry and distress because of Gilbert's refusal to *226 surrender the notes to her sister, Mrs. Chesebrough, a week earlier. There is not an iota of proof that Mr. Kalfus' visit was prompted by any motive but the desire of a friend and fellow company officer to pay his respects to his superior. Indeed, the subject of the notes was not discussed by him and the testatrix until after Gilbert and Irene had come to the apartment while Mr. Kalfus was there, and after their departure testatrix told Mr. Kalfus the story of Gilbert's refusal and asked his advice what to do. Russel learned of his mother's plan only when Mr. Kalfus returned to the company office and told him about it. Any suspicion in this circumstance is dispelled by testatrix' conversations with Mrs. Chesebrough that afternoon after Mr. Kalfus had left, when she told her sister, "Oh, I feel relieved," "I have had a paper drawn up that the notes won't do Gilbert any good so now I will let him wonder why I am not asking for them any more."
Nor do we find any indication of an evil plan or design in the fact that the codicil was witnessed by Russel's wife, Elinor, and two other witnesses brought to the apartment by her. That was done on instructions of the testatrix given by telephone to Elinor. One of the witnesses, Mr. Lioy, had witnessed the original will, and the other, Mr. Dewey, who was Elinor's uncle, was a friend of long standing of the testatrix. There is no reason suggested by appellant to discredit their testimony of what occurred. Both said that upon their arrival and after exchanging greetings, testatrix asked them to excuse her while she read the codicil, which Elinor had brought. She called them back to her room after an interval and explained that she was executing a "codicil" or "addition" to her will, and thereupon she signed it and they and Elinor witnessed it. Testatrix folded it carefully, before they signed, in such manner that they could not read its contents, and after its execution she gave it to Elinor with the request that Elinor take care of it. They talked a while longer in a general vein and then left.
Everything surrounding the execution of the codicil and the subsequent secrecy about it on the part of testatrix and Russel and his wife is entirely consistent with Mrs. Stroming's determination *227 not to have any unpleasantness between her and Gilbert, or between her sons, while she lived. Both Gilbert and his wife, Irene, attempted in their testimony to portray Mrs. Stroming as gullible because impaired in her mental faculties, but the attempt utterly fails. His mother's understanding appreciation of her problem and what was required for its solution, is the determinative fact, fully supported in the proofs, which completely dissipates the inference of selfish design to take advantage of his mother's illness which he charges to his brother. Irene's testimony of her conversation with testatrix on Christmas Day unwittingly substantiated the existence of Mrs. Stroming's actual motive when Irene revealed the strain in her relations with Elinor and Mrs. Stroming's feeling "it would be better if she left Russel the business and my husband the residue of the estate."
The judgment allowed a counsel fee to the attorneys for the executor and directed that such fee, together with costs, be paid from the residuary estate. An allowance of counsel fee to counsel for the appellant was denied. Gilbert challenges these aspects of the judgment and also the amount of the counsel fee allowed the attorneys for the executor as excessive. The applications were addressed to the trial court's discretion and we find no error in its exercise in the circumstances of this case.
Affirmed.