Florence W. Whittaker *vs.* Frank W. Sanford.

Cumberland.   Opinion December 20, 1912.

*Authority.   Case.   Damages.   Evidence.   Exceptions.   Habeas Corpus. Imprisonment.   Motion.   Physical Restraint.   Pleading. Responsibility.   Revised Statutes.   Chapter 101.*

In this action for false imprisonment, the plaintiff claims that she was unlawfully detained and restrained of her liberty by the defendant upon a yacht under his control. Habeas corpus proceedings were commenced in her behalf. A writ of habeas corpus issued, on which the plaintiff was taken before a Justice of this court and she was discharged. No notice of the proceedings had been given to the defendant. The defendant contends that she was free to leave the yacht whenever she chose.

*Held:*

That the record of the habeas corpus proceedings was admissible, as tending to show an improbability that the plaintiff was free to leave the yacht when she chose, but not to charge the defendant with responsibility for her restraint.

It having become pertinent for the plaintiff to show the nature and extent of the authority and influence of the defendant over the yacht's officers and others, all of whom believed in his religious doctrine, and who were members of the religious society of which he was the head, the plaintiff

was properly permitted to introduce evidence that the defendant claims that he is the second Elijah who is to prepare the way for the coming of Christ, and that he is the King mentioned in Biblical prophecies,—the King David who is to reign and rule in righteousness, and before whom all the earth is to bow.

In an action for false imprisonment, the plaintiff must show that the restraint was physical, but not necessarily that force was used upon the person.

If one, in control of a yacht, who is under a duty to furnish transportation to the shore, to a person on board, intentionally refuses to furnish the transportation, and there be no other means of escape, it is a physical restraint, and constitutes unlawful imprisonment.

On motion and exceptions by defendant. Exceptions overruled. If the plaintiff remits all of the verdict in excess of $500 within thirty days after the certificate is received, by the clerk, motion overruled; otherwise, motion sustained.

This is an action on the case to recover damages for false imprisonment. The plaintiff claimed that the defendant held her under restraint on the barkentine "Kingdom" from May 10 to June 6, 1910, in such manner as to constitute false imprisonment. Plea, general issue. The jury rendered a verdict for the plaintiff for $1100. The defendant filed a motion for a new trial and excepted to certain rulings and refusals to rule by the presiding Justice.

The case is stated in the opinion.

*Connellan & Connellan,* for plaintiff.

*H. E. Coolidge, and Oakes, Pulsifer & Ludden,* for defendant.

SITTING: SAVAGE, SPEAR, CORNISH, KING, HALEY, JJ.

SAVAGE, J. Action for false imprisonment. The plaintiff recovered a verdict for $1100. The case comes up on defendant's exceptions and motion for a new trial.

The case shows that for several years prior to 1910, at a locality called "Shiloh" in Durham in this State there had been gathered together a religious sect, of which the defendant was at least the religious leader. They dwelt in a so called colony. There was a similar colony under the same religious leadership at Jaffa, in Syria. The plaintiff was a member of this sect, and her husband

was one of its ministers. For the promotion of the work of the "movement" as it is called, a Yacht Club was incorporated, of which the defendant was president. The Yacht Club owned two sailing yachts, the "Kingdom" and the "Coronet." So far as this case is concerned, these yachts were employed in transporting members of the movement, back and forth, between the coast of Maine and Jaffa.

The plaintiff, with her four children, sailed on the Coronet to Jaffa in 1905. Her husband was in Jerusalem, but came to Jaffa, and there remained until he sailed, a year later, apparently to America. The plaintiff lived in Jerusalem and Jaffa, as a member of the colony, until March, 1909. At that time she decided to abandon the movement, and from that time on ceased to take part in its exercises, or to be recognized as a member. She made her preparations to return to America by steamer, but did not obtain the necessary funds therefor until December 24, 1909. At that time the Kingdom was in the harbor at Jaffa, and the defendant was on board. On Christmas day he sent a messenger to ask the plaintiff to come on board. She went, first being assured by the messenger that she should be returned to shore. The defendant expressed a strong desire that she should come back to America on the "Kingdom, rather than in a steamer, saying, as she says, that he could not bear the sting of having her come home by steamer, he having taken her out. The plaintiff fearing, as she says, that if she came on board the defendant's yacht she would not be let off until she was "won to the movement" again, discussed that subject with the defendant, and he assured her repeatedly that under no circumstances would she be detained on board the vessel after they got into port, and that she should be free to do what she wanted to the moment they reached shore. Relying upon this promise, she boarded the Kingdom on December 28, and sailed for America. She was treated as a guest, and with all respect. She had her four children with her. The defendant was also on board.

The Kingdom arrived in Portland Harbor on the afternoon of Sunday, May 8, 1910. The plaintiff's husband, who was at Shiloh, was telephoned to by someone, and went at once to Portland Harbor, reaching the yacht about midnight of the same day. The

Coronet was also in Portland Harbor at that time. Later both yachts sailed to South Freeport, reaching there Tuesday morning, May 10. From this time until June 6 following the plaintiff claims that she was prevented from leaving the Kingdom, by the defendant, in such manner as to constitute false imprisonment.

THE EXCEPTIONS.

1. The first exception relied upon relates to the admissibility of the record of habeas corpus proceedings, by virtue of which the plaintiff was removed from the Kingdom by a sheriff on June 6, and under which she was discharged later. This record was admitted subject to the defendant's objection and exception. Further, the presiding Justice was requested to instruct the jury that the habeas corpus proceedings were inadmissible, and must be entirely disregarded by them. The presiding Justice declined to give the requested instruction, saying, "I have said all that I desire in regard to the habeas corpus. You have the right to consider the fact as bearing on the conduct of the plaintiff and the situation under which she had applied for it." The presiding Justice in his charge had already said: "It is my duty to say to you that that [the discharge of the plaintiff on habeas corpus] is not a judicial determination of the question involved here. The defendant would not be bound by that adjudication of a single Justice under the circumstances of this case, there being no notice to him and he having no opportunity to be heard upon it. You have a right, I say to you, for the purposes of this trial, to consider the fact that she did resort to this petition of habeas corpus to obtain her release as bearing upon the testimony and all the circumstances surrounding her at that time as tending to show that she was restrained of her liberty." To this refusal to instruct, the defendant took an exception. These exceptions will be considered together.

The case shows that on June 4, 1910, application was made to a Justice of this court for a writ of habeas corpus to take, and bring before the court, the plaintiff and her four minor children, who it was alleged were restrained of their liberty on a certain yacht named Kingdom by the defendant, or by the captain or commanding officer of said Kingdom, or by the person or persons in charge of said Kingdom. The application was made by one Harriman,

under the provisions of R. S., Chap. 101, Section 4, which provides that application may be made "by any person." The Justice ordered "writ to issue as prayed for, returnable before me at the Court House in Auburn, and to be heard on Wednesday, June 8, 1910, 2 P. M." The form prescribed by statute for such a writ contains the following direction to the officer, "and summon the said A. B. [the person alleged to be holding the party in restraint] then and there to appear before our said court, to show cause for taking and detaining said C. D. [the party restrained]." R. S., Chap. 101, Sect. 18. The order for the writ to issue therefore necessarily embraced the direction in the writ to the officer to "summon the defendant." No further order of notice was necessary. But in the writ, as issued by the clerk, the clause commanding the officer to "summon" the defendant was omitted. The officer took the writ and proceeded to the Kingdom, then lying about three miles off shore. He exhibited the writ to the plaintiff's husband, to whom, it is now claimed by the defendant, he had committed the care of, and responsibility for, the plaintiff. Mr. Whittaker read it. The commanding officer asked to take the writ, in order that the stenographer could make a copy of it. This request was complied with. But no service of the writ was made on either the defendant or the commanding officer. The defendant himself was not then on board the Kingdom, but was on the Coronet, lying not far away. The officer took the plaintiff and children, and carried them before the Justice, who after hearing discharged them. The defendant did not attend the hearing. But Mr. Whittaker, the plaintff's husband, went to Auburn, and was in the Court House when the hearing was had, but did not go into the room where it was being held.

It is not necessary now to consider the propriety or legality of the discharge, in the absence of notice to the defendant. The presiding Justice correctly instructed the jury that it was not a judicial determination of the question involved in this case, which was whether the defendant had wrongfully restrained the plaintiff of her liberty. He expressly instructed the jury also that the defendant was not bound by the adjudication. In considering the exception we must assume that the jury heeded the instruction. Limited in its application as it was by the presiding Justice, we think the

record was admissible. In the first place, it was proper for the plaintiff to show when and how she obtained her liberty. It is so closely connected with the question of restraint as to be practically inseparable. It was a part of the history of the transaction, the concluding part. Besides, the pith of the proposition lies not in the discharge, concerning the effect of which the jury were instructed favorably to the defendant, but in the fact that the situation was such that resort was had to habeas corpus. It was a part of the conduct of the parties. It had a tendency to show an improbability that the plaintiff was free to leave the yacht when she should choose. The probative force of it was well stated by the presiding Justice in his charge, in stating the differing contentions of the parties. "It is argued on the part of the plaintiff," he said, "that it is unreasonable and improbable to assert that she was not restrained of her liberty when you find her resorting to a writ of habeas corpus; that if she could have had at any time a boat to go on shore and be taken on shore, that she would not in all human probability have resorted to, or even acquiesced in, the resort of any of her friends to a writ of habeas corpus, for there was no necessity for it." We think the argument is not devoid of merit. How much weight should be given to it was for the jury to say. It will be noticed that this evidence, as the case was submitted by the court to the jury, was applied to the question of restraint of liberty by some one, and not to the responsibility of the defendant for it. We think the rulings were right.

2. The plaintiff claimed and testified that on two or three occasions the defendant personally refused to furnish her with a boat so that she could leave the Kingdom, that when she wanted to go ashore, "they," evidently referring to the defendant and her husband, "had talked against it," that the defendant "had spoken plainly that it was out of the question," that when she spoke to him about it he said he would leave it to her husband to do what he wanted to, that he would not take the responsibility of separating families, but that when she asked her husband to take her ashore, he replied, "We will see Mr. Sanford about it and see what he says." The plaintiff contended that in this way the defendant and her husband in effect played into each other's hands, and shifted

the responsibility from one to the other, while she was the victim of this play of battledore and shuttlecock. It was contended that by virtue of the peculiar religious character attributed to the defendant by those who were in the movement, of whom the plaintiff's husband was one, being a minister of that faith, he possessed and exercised supreme control over the members, both on sea and on land, and that his wish was law both to their wills and to their consciences, and that the plaintiff's husband, whatever part he took in the matter, was either merely the defendant's instrument, or else was colleagued with him.

It therefore became pertinent for the plaintiff to show the nature and extent of the defendant's authority and power. This, of course, was only one step, but it was a step. Another would be to show that the defendant exercised that authority and that it was effective in restraining the plaintiff of her liberty.

And the plaintiff was permitted to testify, subject to exception, to the following effect:—Several years ago the defendant said that God gave him a message, that Elijah was here, that he was the second Elijah, and had come to prepare the way for the coming of Christ, that he talked that to the people in the movement for years, and that they knew him as Elijah; that later he said God gave him messages and made him know that the Kingdom of God was established again on earth, and that God made him know that he was to be king among the people, the twelve tribes of Israel scattered out over all the earth, that God scattered them when they were in Palestine after he had brought them out of the land of Egypt, that they sinned and he scattered them, but he said that in the last days they should be restored and brought back to Palestine, and Palestine should be made a glorious land again as God intended it to be, and these people should be gathered up and brought back and restored to the true religion of Jesus Christ, and that God said in the Bible among the prophesies that when these days come and the people are restored He is going to give them a king; he said that a king shall reign and rule in righteousness; he said that God made him know that he was King David, and that he was to reign and rule in righteousness, and that all the earth was going to bow to him. And the witness testified further, that all the people in the

movement at Shiloh, which seems to have been the original home of the movement, and the place where the plaintiff's husband was minister, know him as King David, and call him so.

In connection with this exception it may be noticed that one of the defendant's witnesses, a member of the movement, and apparently a frank and intelligent man, being asked on cross-examination to explain why the defendant is sometimes called King David, testified without objection:—"We believe that Mr. Sanford is the David that is spoken of as the character that is to appear in the last days to prepare God's people for the coming of Christ."

Under the circumstances of this case, we think that the evidence objected to was admissible. We think it is a fair inference that a person believed by his followers to possess the character thus attributed to the defendant would be very likely to obtain the power and influence over them, which it is claimed the defendant had. This is not a religious question, but a question of law. We are not concerned in this case with the beliefs of the defendant and those connected with him. We do not seek to impugn in the slightest degree the grounds of their beliefs. But, whether right or wrong, we think that it is clear that to the trusting and devout followers of such a leader, his influence, his will, his wish, might easily, and probably would, become paramount over their minds, and would control their actions. Besides, the question of the nature and extent of the defendant's control was made relevant by the defendant's contention that the captain and other officers of the yacht, and not the defendant, were in control of the small boats and that the control was practically independent of the defendant. It must be remembered that this discussion goes only to the admissibility of the evidence, and not to its effect. If in fact the power was not used by the defendant to keep the plaintiff on board the yacht against her will, the possession of the power cannot count against the defendant.

3. The plaintiff's writ was brought in a plea of the case, but the defendant contends that the declaration in her writ was in its effect a declaration for trespass to the person. The defendant requested the court to instruct the jury that "to maintain her action the plaintiff must show some actual physical force exercised

by the defendant or by someone acting as his agent and by his authority to restrain her of her liberty."

We think the defendant's assumption in his request that the action in effect is trespass to the person is without warrant. In argument, stress is laid upon the use of the words "with force and arms." These words appear only in the first and fourth counts. But the record shows that the court at the defendant's request instructed the jury that the plaintiff could not recover under either of these counts. They are out of the case now. In the remaining counts it is alleged that the unlawful restraint was "by force and against the will of the plaintiff." The court instructed the jury that the plaintiff to recover must show that the restraint was physical, and not merely a moral influence, that it must have been actual physical restraint, in the sense that one intentionally locked into a room would be physically restrained, but not necessarily involving physical force upon the person; that it was not necessary that the defendant, or any person by his direction, should lay his hand upon the plaintiff, that if the plaintiff was restrained so that she could not leave the yacht Kingdom by the intentional refusal to furnish transportation as agreed, she not having it in her power to escape otherwise, it would a physical restraint and unlawful imprisonment. We think the instructions were apt and sufficient. If one should, without right, turn the key in a door, and thereby prevent a person in the room from leaving, it would be the simplest form of unlawful imprisonment. The restraint is physical. The four walls and the locked door are physical impediments to escape. How is it different when one who is in control of a vessel at anchor, within practical rowing distance from the shore, who has agreed that a guest on board shall be free to leave, there being no means to leave except by rowboats, wrongfully refuses the guest the use of a boat? The boat is the key. By refusing the boat he turns the key. The guest is as effectually locked up as if there were walls along the sides of the vessel. The restraint is physical. The impassable sea is the physical barrier.

There are other exceptions, but the points involved are all covered by the foregoing discussion. The exceptions must all be overruled.

THE MOTION.

A careful study of the evidence leads us to conclude that the jury were warranted in finding that the defendant was guilty of unlawful imprisonment. This, to be sure, is not an action based upon the defendant's failure to keep his agreement to permit the plaintiff to leave the yacht as soon as it should reach shore. But his duty under the circumstances is an important consideration. It cannot be believed that either party to the agreement understood that it was his duty merely to bring her to an American harbor. The agreement implied that she was to go ashore. There was no practical way for her to go ashore except in the yacht's boats. The agreement must be understood to mean that he would bring her to land, or to allow her to get to land, by the only available means. The evidence is that he refused her a boat. His refusal was wrongful. The case leaves not the slightest doubt that he had the power to control the boats, if he chose to exercise it. It was not enough for him to leave it to the husband to say whether she might go ashore or not. She had a personal right to go on shore. If the defendant personally denied her the privilege, as the jury might find he did, it was a wrongful denial.

It is shown that on several occasions the defendant told the plaintiff she could have a boat when she wished, but it is also shown by testimony which the jury might believe that each time she made request for a boat to be used at the time, she was refused. The plaintiff did not ask the captain or other officers of the yacht for a boat. These officers testified that they had authority to let anyone have the use of a boat, and that, without consulting the defendant. We do not think the defendant can justly claim that she should have asked the officers under him, if he had himself denied her a boat. And in the one specific case shown in the evidence, when she did ask the captain for a boat to go on shore, he referred the discussion of the matter to the defendant. This was at Malta. She apparently believed that an appeal to the officers would be useless. It was not an unreasonable belief.

The defendant did not become a witness, but it is claimed for him that after Tuesday, May 10, he assumed no responsibility whatever for the plaintiff, and left her in the care of her husband,

specifically saying that he would leave it to her husband to say whether she could leave the yacht. From that date, he stayed on the Coronet, only coming aboard the Kingdom once, though on that occasion she says he refused her the use of a boat. From that date she was in the company of her husband, though they were not living in marital relations. She went ashore with him. She visited neighboring islands with him. She was trying to persuade him to leave the movement and make a home for her and their children. He was trying to persuade her to become again a member of the movement. When on shore with him she made no effort to escape. She says she believed it would be useless, and thus went back to the yacht with him. She says that when she did ask her husband to put her ashore to leave, he replied, "We will see Mr. Sandford about it and see what he says." She further says that the defendant had told her that "he" (her husband) "couldn't do it" (put her on shore).

Besides the evidence of express personal refusal on the part of the defendant, we think that a jury might well find upon the evidence that the defendant was strongly desirous that the plaintiff should not leave the yacht, probably for the reason that he hoped her husband's influence might lead her back into the movement, that the husband was strongly desirous of the same end, that if she left the yacht she would be beyond the influence of her husband; that the subject was a matter of conversation between the defendant and the husband; that in view of the relation which the defendant bore to the movement and to the husband, in view of the mystical character attributed to him, in view of the manifest power possessed by him over the minds of the members, growing out of a belief which we have already stated, and which the husband shared in, the husband, if not acting by express mutual understanding with the defendant, was the minister of his known will, with the result that the plaintiff was prevented from leaving the yacht; that the defendant was the superior, the controlling factor, by an influence intentionally used, in keeping her there; that he possessed the key that would unlock the situation; and that in violation of his duty he refused to use it, and thus restrained her of her liberty. If all this was true, the defendant is liable to the plaintiff. The verdict should not be set aside on that ground.

But the damages awarded seem to us manifestly excessive. The plaintiff, if imprisoned, was by no means in close confinement. She was afforded all the liberties of the yacht. She was taken on shore by her husband to do shopping and transact business at a bank. She visited neighboring islands with her husband and children, on one of which they enjoyed a family picnic. The case lacks the elements of humiliation and disgrace that frequently attend false imprisonment. She was respectfully treated as a guest in every way, except that she was restrained from quitting the yacht for good and all.

The certificate will be,

> *Exceptions overruled.*    *ι*
> *If the plaintiff remits all of the verdict in excess of $500, within 30 days after the certificate is received by the clerk, motion overruled; otherwise, motion sustained.*