696 A.2d 697

F.G., PLAINTIFF–RESPONDENT, v. REVEREND ALEX MACDO-
NELL, IN HIS CAPACITY AS FORMER RECTOR, AND REVER-
END FLETCHER HARPER, IN HIS CAPACITY AS RECTOR OF
ALL SAINTS' EPISCOPAL CHURCH, BERGENFIELD, NEW
JERSEY AND ST. LUKE'S EPISCOPAL CHURCH, HAWORTH,
NEW JERSEY, DEFENDANTS–APPELLANTS.

Argued March 3, 1997—Decided July 22, 1997.

552

*Gregory D. Winter* argued the cause for appellant Reverend Alex MacDonell (*Felzenberg, Winter & Winkler,* attorneys).

*David S. Rutherford,* a member of the New York bar, argued the cause for appellant Reverend Fletcher Harper (*Renzulli, Gainey & Rutherford,* attorneys).

*Alan L. Zegas* and *Herbert D. Friedman,* a member of the Massachusetts bar, argued the cause for respondent (*Mr. Zegas,* attorney; *Mr. Friedman* and *Sharon J. Bittner,* on the brief).

*Martin F. McKernan, Jr.,* submitted briefs on behalf of amicus curiae New Jersey Catholic Conference (*McKernan, McKernan &*

*Godino,* attorneys; *Mr. McKernan* and *James J. Godino, Jr.,* on the briefs).

*Douglas E. Arpert* and *Sanford D. Brown* joined in the briefs submitted by The New Jersey Catholic Conference on behalf of amici curiae Bishop Alfred Johnson, Northern New Jersey Annual Conference of the United Methodist Church and Southern New Jersey Annual Conference of the United Methodist Church (*Evans Hand* and *Cerrato, Dawes, Collins, Saker & Brown,* attorneys).

The opinion of the court was delivered by

POLLOCK, J.

This appeal presents two issues. The first issue is whether a parishioner's allegation of an inappropriate sexual relationship between a clergyman and the parishioner states a cause of action when the relationship occurs while the clergyman is providing pastoral counseling to the parishioner. Second, we must decide whether the parishioner may maintain a cause of action against another clergyman who allegedly publicized in a sermon and a letter the relationship with the first clergyman.

The Law Division dismissed all claims of the parishioner, F.G., against the first clergyman, the Reverend Alex MacDonell, as well as her claim against the second clergyman, the Reverend Fletcher Harper, for clergy malpractice and breach of fiduciary duty. The Appellate Division reversed and remanded the matter to the Law Division. 291 *N.J.Super.* 262, 677 *A.*2d 258 (1996). We granted leave to appeal to MacDonell and Harper. 146 *N.J.* 562, 683 *A.*2d 1159 (1996).

We conclude that F.G., may maintain a cause of action for breach of fiduciary duty against MacDonell, formerly the rector of All Saints Episcopal Church, Bergenfield, New Jersey (All Saints). MacDonell, who was married at the time of the events described in the complaint, is the clergyman who allegedly induced F.G. to engage in the inappropriate sexual relationship. F.G.'s cause of action against defendant Rev. Fletcher Harper is more problemat-

ic. Harper wrote a letter and delivered a sermon to the congregation about MacDonell's relationship with F.G. Whether F.G. may maintain her action against Harper depends on whether a court may adjudicate her claims without becoming entangled in church doctrine. If on remand the Law Division concludes it can avoid any such entanglement, then F.G. may maintain her cause of action against Harper for breach of fiduciary duty.

## I.

Because the appeal arises on defendants' motion for judgment on the pleadings under *Rule* 4:6–2(e), we assume the truth of the allegations of the complaint, giving plaintiff the benefit of all reasonable factual inferences that those allegations support. *See Independent Dairy Workers Union v. Milk Drivers Local 680,* 23 *N.J.* 85, 89, 127 *A.2d* 869 (1956). If a generous reading of the allegations merely suggests a cause of action, the complaint will withstand the motion. *Printing Mart–Morristown v. Sharp Elec. Corp.,* 116 *N.J.* 739, 746, 563 *A.2d* 31 (1989). So read, the record supports the following factual statement.

In 1992, MacDonell was the rector at both All Saints and an affiliated church, St. Luke's Episcopal Church, in Haworth. Harper was the assistant rector at both churches in 1993. In January 1994, following MacDonell's retirement, Harper succeeded MacDonell as rector. F.G. was a parishioner at All Saints in 1992–93.

From April 1992 until the end of 1993, F.G. consulted MacDonell for counseling. Aware that F.G. was vulnerable, MacDonell nonetheless induced her to engage in a sexual relationship with him. Although the complaint does not describe details of the relationship, it apparently did not involve sexual intercourse.

In Count I, F.G. seeks recovery for clergy malpractice. She alleges that MacDonell owed her "a special duty of care not to engage in unethical and harmful behavior towards [her]." The complaint continues that he "engaged in sexual behavior with [her] inappropriate to and in violation of [the special relationship]" he

owed her, and that "he failed to exercise the degree of skill, care and diligence which is exercised by the average qualified pastoral counselor provider." In Count II, F.G. seeks recovery for negligent infliction of emotional distress. Finally, in Count III, F.G. alleges that as her pastor, MacDonell owed her "a strict fiduciary duty to act in good faith and in her best interests and to refrain from conduct" that carried the risk of harm. F.G. asserts that MacDonell "breached his fiduciary duty by wrongfully and unlawfully exploiting F.G.'s trust and confidence by engaging in inappropriate sexual behavior with [her] and creating an unreasonable risk of mental and emotional harm to [her]."

The remaining counts allege claims against Harper. F.G. alleges that on March 31, 1994, she met with Harper to discuss MacDonell's "inappropriate physical conduct" with her and "the possibility of notifying the parishes of All Saints and St. Lukes" about that contact. Harper knew that she had been receiving inpatient care at a psychiatric hospital and that she had tried to commit suicide five days before the meeting.

In Count IV, F.G. alleges that Harper owed her a duty of care "not to publish any identifying information, including her identity and the nature and extent of defendant MacDonell's inappropriate sexual behavior with her, to the members of the parishes of [All Saints and St. Lukes]." On April 14, 1994, in breach of that duty and without F.G.'s consent, Harper published an open letter to the parishioners of the two churches. In his April 17 sermon at St. Luke's, Harper identified F.G. and described some details of MacDonell's inappropriate sexual behavior. Count IV concludes by alleging that Harper's conduct constituted a breach of F.G.'s privacy.

Count V alleges a claim in negligent misrepresentation asserting that Harper negligently represented that public disclosure of F.G.'s name was for her benefit and part of his pastoral care for her. He never informed her "that he intended to publish details concerning defendant MacDonell's inappropriate physical contact with her and never requested nor received F.G.'s consent to do

same." Instead, the letter and sermon falsely suggested that she and MacDonell "were engaged in a voluntary romantic relationship between two consenting, mature adults rather than an abusive relationship between a pastoral care provider and pastoral counselor and a client." F.G. contends that Harper presented her relationship with MacDonell as a "romantic relationship" and erroneously suggested that she had tried to seduce MacDonell. In Counts VI, VII, and VIII the complaint respectively alleges claims for negligent infliction of emotional distress, defamation, and depiction in a false light. Finally, Count IX alleges that Harper breached a fiduciary duty owed to F.G.

The Law Division dismissed Counts I, II, III, and IX, which respectively allege negligent pastoral counseling, negligent infliction of emotional distress, and breach of fiduciary duty by MacDonell, as well as breach of fiduciary duty by Harper. The Appellate Division reversed and remanded the matter to the Law Division. The purpose of the remand was to permit F.G. to prove her claims against defendants for clergy malpractice and breach of their fiduciary duty.

We believe that a claim for breach of fiduciary duty provides the more appropriate form of relief than does clergy malpractice. An action for breach of a clergyman's fiduciary duty permits the parishioner to recover monetary damages without running the risk of entanglement with the free exercise of religion. Consequently, we modify the judgment of the Appellate Division by allowing F.G.'s claim for breach of fiduciary duty against MacDonell, and, subject to a hearing on entanglement with church doctrine, allowing a similar claim against Harper.

## II.

The threshold issue is whether the First Amendment to the United States Constitution shields a member of the clergy from a claim for inappropriate sexual conduct with a parishioner who has consulted the clergy member for pastoral counseling. Defendants maintain that F.G.'s claims, whether characterized as

for clergy malpractice or for breach of fiduciary duty, necessarily entangle the courts in the free exercise of religion. We disagree. The free exercise of religion does not permit members of the clergy to engage in inappropriate sexual conduct with parishioners who seek pastoral counseling.

■ The First Amendment prohibits any "law respecting the establishment of religion, or prohibiting the free exercise thereof." *U.S. Const.* amend. I. It, however, does not prohibit courts from any involvement in religious disputes. The amendment merely prohibits courts from determining underlying questions of religious doctrine and practice. *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 *U.S.* 440, 449, 89 *S.Ct.* 601, 606, 21 *L.Ed.*2d 658, 665 (1969).

■ A party challenging state action as violative of free-exercise rights must establish that the action produces a coercive effect on the practice of religion. *Abington School Dist. v. Schempp,* 374 *U.S.* 203, 223, 83 *S.Ct.* 1560, 1572, 10 *L.Ed.*2d 844, 858 (1963). The conduct at issue must have been part of the beliefs and practices of the defendant's religion. *See Wisconsin v. Yoder,* 406 *U.S.* 205, 215–16, 92 *S.Ct.* 1526, 1533–34, 32 *L.Ed.*2d 15, 25–26 (1972) (stating "to have the protection of the [r]eligious [c]lause the claims must be rooted in religious belief").

■ A court may not inquire into the validity of a religious belief or practice that prompts the challenged conduct. *United States v. Ballard,* 322 *U.S.* 78, 64 *S.Ct.* 882, 88 *L.Ed.* 1148 (1944). A court, however, may apply neutral principles of law to decide an issue that does not implicate religious doctrine. *See Elmora Hebrew Ctr. Inc. v. Fishman,* 125 *N.J.* 404, 413, 593 *A.*2d 725 (1991) (stating "religious parties or institutions are not . . . less entitled to civil adjudication of secular legal questions"). Neutral principles "are wholly secular legal rules whose application to religious parties or disputes does not entail theological or doctrinal evaluations." *Id.* at 414–15, 593 *A.*2d 725. Only "when the underlying dispute turns on doctrine or polity" should a court

refuse to enforce secular rights. *Welter v. Seton Hall Univ.,* 128 *N.J.* 279, 293, 608 *A.*2d 206 (1992).

Courts in other jurisdictions have found that when purely secular conduct is at issue, they may hold churches and clerics liable for the effect of their conduct on third parties. Thus, the Supreme Court of Colorado has permitted claims for breach of fiduciary duty, when the claims did not arise from ecclesiastical matters. *Moses v. Diocese of Colorado,* 863 *P.*2d 310, 323 (Colo. 1993), *cert. denied,* 511 *U.S.* 1137, 114 *S.Ct.* 2153, 128 *L.Ed.*2d 880 (1994). Similarly, an Oregon Court has concluded that claims for breach of fiduciary duty and intentional infliction of emotional distress did not violate the First Amendment. *Erickson v. Christenson,* 99 *Or.App.* 104, 781 *P.*2d 383, 386 (1989).

Likewise, courts have recognized claims for intentional torts against clergymen. Thus, clergymen have been held liable for obtaining gifts and donations of money by fraud, *Ballard, supra,* 322 *U.S.* 78, 64 *S.Ct.* 882, 88 *L.Ed.* 1148; sexual assault, *Mutual Service Cas. Ins. Co. v. Puhl,* 354 *N.W.*2d 900 (Minn.Ct.App.1984); unlawful imprisonment, *Whittaker v. Sandford,* 110 *Me.* 77, 85 *A.* 399 (1912); alienation of affections, *Hester v. Barnett,* 723 *S.W.*2d 544, 555 (Mo.Ct.App.1987); and for sexual harassment, intentional infliction of emotional distress, and defamation, *Guinn v. Church of Christ,* 775 *P.*2d 766, 785–86 (Okla.1989).

F.G. alleges that MacDonell, while acting as F.G.'s pastoral counselor, improperly induced her to engage in a sexual relationship. She claims that his conduct caused her to sustain physical injury, extreme emotional and psychological injury, and economic loss. Further, she asserts his alleged wrongdoing falls outside Episcopal doctrine. Consequently, F.G. concludes that the First Amendment does not protect MacDonell.

In depositions, both MacDonell and Harper acknowledged that a sexual relationship between a married rector and an unmarried parishioner violates the rector's fiduciary duty to the parishioner. Furthermore, defendants acknowledged that they were unaware of any Episcopal teachings that sanction a sexual relationship

between a married rector and an unmarried parishioner. MacDonell specifically testified that Episcopal teaching condemns such conduct.

Two other church officials, Bishop John Spong of the Episcopal Archdiocese of Newark and Reverend Franklin Vilas, the chairman of the Standard Commission on Clergy Ethics of the Diocese of Newark, testified that Episcopal Church doctrine does not sanction improper sexual conduct by rectors. Bishop Spong also testified that by engaging in sexually exploitative conduct with F.G., MacDonell violated his fiduciary duty to her. In sum, the record supports the inference that MacDonell's alleged misconduct was not an expression of a sincerely held religious belief, but was an egregious violation of the trust and confidence that F.G. reposed in him.

The First Amendment does not insulate a member of the clergy from actions for breach of fiduciary duty arising out of sexual misconduct that occurs during a time when the clergy member is providing counseling to a parishioner. Thus, without impinging on the First Amendment, courts can resolve a claim that a member of the clergy has committed sexually inappropriate conduct in the course of pastoral counseling.

### III.

The next question concerns the nature of the duty that defendants owed to F.G. The Appellate Division held that defendants owed F.G. a duty of care, that they breached that duty, and that she could maintain a cause of action for "clergy malpractice." In so concluding, the Appellate Division acknowledged that F.G.'s claim presented an issue of first impression in New Jersey, and that no other court in the United States had yet recognized a clergy-malpractice claim. 291 *N.J.Super.* at 267–71, 677 *A.*2d 258; *see Dausch v. Rykse,* 52 *F.*3d 1425, 1432 n. 4 (7th Cir.1994) (collecting cases from state supreme courts holding no cause of action for clergy malpractice). Deterring other courts has been the concern that a clergy-malpractice claim will entangle courts

with the First Amendment's protection of the free exercise of religion. *See, e.g., Nally v. Grace Community Church,* 47 *Cal.*3d 278, 253 *Cal.Rptr.* 97, 109–10, 763 *P.*2d 948, 960 (1988) (stating "it would certainly be impractical, and quite possibly unconstitutional, to impose a duty of care on pastoral counselors"), *cert. denied* 490 *U.S.* 1007, 109 *S.Ct.* 1644, 104 *L.Ed.*2d 159 (1989); *Schmidt v. Bishop,* 779 *F.Supp.* 321, 327–28 (S.D.N.Y.1991) (finding excessive entanglement if court were to define or express standard of care to be followed by other reasonable clerics in community).

Several problems inhere in a claim for clergy malpractice. First, such a claim requires definition of the relevant standard of care. Defining that standard could embroil courts in establishing the training, skill, and standards applicable for members of the clergy in a diversity of religions with widely varying beliefs. *Strock v. Pressnell,* 38 *Ohio St.*3d 207, 527 *N.E.*2d 1235, 1239 (1988). Furthermore, defining such a standard would require courts to identify the beliefs and practices of the relevant religion and then to determine whether the clergyman had acted in accordance with them. *Schmidt, supra,* 779 *F.Supp.* at 328; *see also Dausch, supra,* 52 *F.*3d at 1432 (emphasizing evaluation of clergy malpractice complaint would require courts extensively to evaluate and investigate religious tenets and doctrine); *Nally, supra,* 253 *Cal.Rptr.* at 109–10, 763 *P.*2d at 960 (noting "the secular state was not equipped to ascertain the competency of counseling when performed by those affiliated with religious organizations"); *Destefano v. Grabrian,* 763 *P.*2d 275, 290 (Colo.1988) (Quinn, C.J., specially concurring) (finding judicial recognition of clergy malpractice action creates a "formidable obstacle to bona fide religious . . . counseling [that] would fly directly in the face of the Free Exercise Clause"); *Hester, supra,* 723 *S.W.*2d at 553 (observing clergy malpractice would force courts to judge "competence, training, methods, and content of the pastoral function" in deciding whether cleric breached his or her duty of care); *Bladen v. First Presbyterian Church,* 857 *P.*2d 789, 797 (Okla.1993) (stating "[o]nce a court enters the realm of trying to define the nature

of advice a minister should give a parishioner[,] serious First Amendment issues are implicated"). The entanglement could restrain the free exercise of religion.

Concerns about religious entanglement have led some courts also to deny claims for breach of fiduciary duty. *Id.* at 326 (stating "in analyzing and defining the scope of a fiduciary duty owed persons by their clergy, the Court would be confronted by the same constitutional difficulties encountered in articulating the generalized standard of care for a clergyman required by the law of negligence"); *see also Schieffer v. Catholic Archdiocese of Omaha,* 244 *Neb.* 715, 508 *N.W.*2d 907, 912 (1993) (agreeing with reasoning of *Schmidt* and rejecting fiduciary duty claims against clergy members); *Strock, supra,* 527 *N.E.*2d at 1243 (stating claim for breach of fiduciary duty is essentially claim for negligence); *Bladen, supra,* 857 *P.*2d at 796 (same). We conclude, however, that courts can adjudicate F.G.'s claim for breach of fiduciary duty without becoming entangled in the defendants' free exercise of their religion.

 The essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position. A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship. *Restatement (Second) of Torts* § 874 cmt. a (1979); *see In re Stroming's Will,* 12 *N.J.Super.* 217, 224, 79 *A.*2d 492 (App.Div.), *certif. denied,* 8 *N.J.* 319, 85 *A.*2d 272 (1951) (stating essentials of confidential relationship "are a reposed confidence and the dominant and controlling position of the beneficiary of the transaction"); *Blake v. Brennan,* 1 *N.J.Super.* 446, 453, 61 *A.*2d 916 (Ch.Div.1948) (describing "the test [as] whether the relationship between the parties were of such a character of trust and confidence as to render it reasonably certain that the one party occupied a dominant position over the other"); Bogert, *Trusts and Trustees* 2d § 481 (1978) (stating "[t]he exact limits of the term 'fiduciary relation' are impossible of statement. Depending upon

the circumstances of the particular case or transaction, certain business, public or social relationships may or may not create or involve a fiduciary character."). The fiduciary's obligations to the dependent party include a duty of loyalty and a duty to exercise reasonable skill and care. *Restatement (Second) of Trusts* §§ 170, 174 (1959). Accordingly, the fiduciary is liable for harm resulting from a breach of the duties imposed by the existence of such a relationship. *Restatement (Second) of Torts* § 874 (1979).

 Trust and confidence are vital to the counseling relationship between parishioner and pastor. By accepting a parishioner for counseling, a pastor also accepts the responsibility of a fiduciary. Often, parishioners who seek pastoral counseling are troubled and vulnerable. Sometimes, they turn to their pastor in the belief that their religion is the most likely source to sustain them in their time of trouble. The pastor knows, or should know of the parishioner's trust and the pastor's dominant position.

Several jurisdictions have recognized that a clergyman's sexual misconduct with a parishioner constitutes a breach of a fiduciary relationship. *See, e.g., Sanders v. Casa View Baptist Church,* 898 *F.Supp.* 1169, 1176 (N.D.Tex.1995) (denying motion to dismiss breach-of-fiduciary-duty claims against minister); *Moses, supra,* 863 *P.*2d at 323 (holding record supported jury finding that fiduciary relationship existed between Bishop, diocese, and plaintiff, and that such duty was breached); *Destefano, supra,* 763 *P.*2d at 284 (recognizing viability of breach of fiduciary duty claims against members of clergy); *Erickson, supra,* 781 *P.*2d at 386 (same); *Adams v. Moore,* 96 *N.C.App.* 359, 385 *S.E.*2d 799, 801 (1989) (finding preacher violated fiduciary duty by using position and influence to obtain deed to parishioner's home). We find the rationale of those cases to be persuasive. In *Destefano, supra,* the Colorado Supreme Court held that the defendant, a Catholic priest, owed a fiduciary duty to a parishioner who sought counseling from him concerning her marital problems. 763 *P.*2d at 284. By engaging in sexual intercourse with the parishioner, the priest breached a fiduciary duty that he owed her. *Ibid.* Subsequently,

in *Moses, supra,* the same court considered the case of a parishioner who entered into a sexual relationship with an associate priest during a counseling relationship. 863 *P.*2d at 314. The Court found sufficient evidence for the jury to conclude that the defendants, an Episcopalian bishop and the diocese, owed a fiduciary duty to the plaintiff and that they had breached that duty by failing to provide the parish with personnel files indicating that the priest had psychological problems. *Id.* at 315.

Unlike an action for clergy malpractice, an action for breach of fiduciary duty does not require establishing a standard of care and its breach. *Moses, supra,* 863 *P.*2d at 321, n. 13. Establishing a fiduciary duty essentially requires proof that a parishioner trusted and sought counseling from the pastor. A violation of that trust constitutes a breach of the duty.

The dissent recoils from the prospect that inappropriate sexual misconduct by a member of the clergy could result in liability to an adult parishioner who has consulted the clergy member for counseling. Yet, the dissent acknowledges that a member of the clergy could be liable if the parishioner "was legally unable to give consent to sexual relations," *post* at 573, 696 *A.*2d at 709, or if the parishioner was a child, *post* at 568, 570, 696 *A.*2d at 706, 707. The dissent, nonetheless, would permit a clergyman to victimize a parishioner whose vulnerability has led the parishioner to seek refuge in pastoral counseling. In the final analysis, the dissent simply refuses to accept that pastoral counselors, like psychotherapists, see *N.J.A.C.* 13:42–10.9, may be liable for breach of a fiduciary relationship with a parishioner.

Ordinarily, consenting adults must bear the consequences of their conduct, including sexual conduct. In the sanctuary of the church, however, troubled parishioners should be able to seek pastoral counseling free from the fear that the counselors will sexually abuse them. Our decision does no more than extend to the defenseless the same protection that the dissent would extend to infants and incompetents.

F.G.'s complaint essentially alleges that MacDonell's sexual misconduct was not so much a failure to adhere to the standards of care applicable to pastoral counseling as it was a violation of F.G.'s trust. But for MacDonell's status as a clergyman, his conduct was unrelated to religious doctrine. Although MacDonell's ultimate goal in counseling F.G. may have been to help her receive assistance from God, his sexual misconduct violated her legal rights. So viewed, F.G.'s claim does not restrict MacDonell's free exercise of religion.

The Appellate Division also reinstated F.G.'s claim for negligent infliction of emotional distress. 291 *N.J.Super.* at 276, 677 *A.*2d 258. We likewise conclude that F.G. may maintain her claim for emotional distress arising from MacDonell's breach of his fiduciary duty to her. Our recognition of F.G.'s claim is consistent with the general rule that a claimant who suffers emotional trauma may recover from the tortfeasor who has caused the claimant distress. *Gendek v. Poblete,* 139 *N.J.* 291, 296, 654 *A.*2d 970 (1995).

F.G.'s claim against Harper presents additional considerations. Basically, F.G. alleges that she consulted Harper for counseling because of MacDonell's inappropriate physical conduct with her and "the possibility of notifying the parishes of All Saints and St. Lukes" about that conduct. F.G. alleges further that Harper induced F.G. "to give consent to the public disclosure, by letter, of [her] name," by his negligent misrepresentation "that this disclosure was for [her] benefit and part of his pastoral care [of her]." According to F.G., Harper breached his fiduciary duty by "exploiting [her] trust and confidence" through his mischaracterization of MacDonell's conduct and the nature of the relationship between him and F.G.

Our review of those allegations begins with the realization that Harper's alleged breaches occurred in sermons and letters to the congregations. Evaluating those sermons and letters might entangle a court in religious doctrine. The question remains whether, without becoming entangled in religious doctrine, a court can

adjudicate Harper's alleged breach of his fiduciary duty to F.G. If the trial court can make such a determination by reference to neutral principles, F.G. may maintain her action against Harper. We conclude that the trial court should conduct a hearing to determine whether it can decide F.G.'s allegations by reference to such principles. *Elmora, supra,* 125 *N.J.* at 414, 593 *A.*2d 725. If so, F.G. may proceed with her action against Harper.

## IV.

In sum, we conclude that F.G. may proceed with her claims for breach of fiduciary duty and negligent infliction of emotional distress against MacDonell.

Whether F.G. may proceed against Harper for his alleged breach of fiduciary duty depends on the outcome of the *Elmora* hearing.

The judgment of the Appellate Division is affirmed in part and reversed in part, and the matter is remanded to the Law Division.

O'HERN, J., dissenting.

The majority states that the "threshold issue is whether the First Amendment to the United States Constitution shields a member of the clergy from a claim for inappropriate sexual conduct with a parishioner who has consulted the clergy member for pastoral counseling." *Ante* at 558, 696 *A.*2d at 701. Reasoning that the First Amendment to the United States Constitution may be asserted as a defense to a defendant's conduct only when the conduct that caused the plaintiff's injury finds its basis in religious beliefs and practice, *Wisconsin v. Yoder,* 406 *U.S.* 205, 92 *S.Ct.* 1526, 32 *L.Ed.*2d 15 (1972), the majority concludes that because the pastor acknowledges that no tenet of his religion sanctions sexual contact with a congregant, the conduct is a tort. Such reasoning misses the constitutional point entirely. Reverend MacDonell is not asserting that conduct otherwise tortious is protected because it is religious. Rather, F.G. asserts that the conduct is tortious because the defendant is a religious.

It is simply impossible for a court to define the duties of a member of the clergy and impose civil liability therefor. To do so would establish an official religion of the state, something forbidden by the First Amendment.

I must emphasize at the outset that the First Amendment does not protect pedophiles or charlatans wearing religious garb. Members of religious bodies are as liable for worldly wrongs as are any other members of society. A minister, priest or rabbi has no license to steal and no license to commit a sexual offense condemned by law:

It is well settled that clergy may be sued for the torts they commit. For example, religious leaders have been held liable for obtaining gifts and donations of money by fraud, *United States v. Ballard* (1944), 322 *U.S.* 78, 64 *S.Ct.* 882, 88 *L.Ed.* 1148; for undue influence in the transfer of property, *Nelson v. Dodge* (1949), 76 *R.I.* 1, 68 *A.*2d 51; for the kidnapping of a minor, for damages to the parents resulting therefrom, and for malicious prosecution of the mother in alleging she was an unfit parent, *Magnuson v. O'Dea* (1913), 75 *Wash.* 574, 135 *P.* 640; for unlawful imprisonment, *Whittaker v. Sandford* (1912), 110 *Me.* 77, 85 *A.* 399; for homosexual assault, *Mutual Service Cas. Ins. Co. v. Puhl* (Minn.App.1984), 354 *N.W.*2d 900 . . . .

[*Strock v. Pressnell*, 38 Ohio St.3d 207, 527 *N.E.*2d 1235, 1237 (1988).]

Each such act was tortious or wrong, not because the actors were clerics, but because the conduct would have been wrong for every member of society.

The problem for F.G. is that no law makes it a tort or crime for consenting adults to engage in sexual relationships. *See State v. Saunders*, 75 *N.J.* 200, 381 *A.*2d 333 (1977) (discussing what sexual conduct between certain adults may be made criminal). The only basis for tort liability set forth in plaintiff's complaint is the following: "During the course of their pastoral care and pastoral counselling relationship there was a breach of the special duty of care which MacDonell owed F.G. as her pastoral care provider and pastoral counsellor." Had Alex MacDonell been a neighbor, co-worker, or friend seeking to comfort F.G., no secular law would make his extramarital affair a tort or crime.

No court in the United States has created a tort of clergy malpractice for the simple reason that to do so would require a

court to establish a state religion. *See* Carl H. Esbeck, *Tort Claims Against Churches and Ecclesiastical Officers: the First Amendment Considerations*, 89 *W. Va. L.Rev.* 1 (1986) (explaining that such inquiry would require courts to establish a set of acceptable religions).

In *Hester v. Barnett*, 723 *S.W.*2d 544, 553 (Mo.Ct.App.1987), the court observed: "[A] theory of malpractice is defined in terms of the duty to act with that degree of skill and learning ordinarily used in the same or similar circumstances by members of that profession." Recognizing clergy malpractice would force a court to judge "the competence, training, methods and content of the pastoral function" in deciding whether the cleric breached this duty. *Ibid.* Just a few months ago, the Wisconsin Supreme Court reaffirmed in the context of a cleric's sexual relations with another, that a claim for negligent supervision of conduct that offended no civil law "was precluded by the First Amendment because it would require an inquiry into church laws, practices, and policies." *L.L.N. v. Clauder*, 209 *Wis.*2d 674, 563 *N.W.*2d 434, 441 (1997).

In almost identical circumstances, a husband complained that an adulterous sexual relationship between his wife and an Episcopal priest had an adverse effect on his wife's mental status to the extent that it may have caused her suicide. *Roppolo v. Moore*, 644 *So.*2d 206 (La.Ct.App.1994), *writ denied*, 650 *So.*2d 253 (La. 1995). The court explained that it could not base tort liability on the religious affiliation of a sexual partner. "[T]hey were both adults. As there is no civil nor criminal prohibition against such conduct between adult laypersons the State cannot penalize such conduct because Dr. Moore was an Episcopal priest." *Id.* at 208. To do so would require this Court to determine the standards of the Episcopal Church and "then put the weight of the State behind those standards or to require a different standard of behavior of the clergy." *Ibid.* The State cannot penalize sexual conduct between adult laypersons because such conduct violates no law.

F.G. relies on the depositions of the Episcopal bishop of the diocese and Rector MacDonell, each of whom acknowledged that sexual conduct with a parishioner was beyond the tenets of the Episcopal Church. Still, the Court cannot "put the weight of the State" behind those standards in order to impose civil liability. *Ibid.* To do so would establish the tenets of Episcopal religion as the basis for civil liability.

Much needless confusion has arisen in this area because some courts have mistakenly allowed religious to plead the Free Exercise Clause as a defense to conduct that was plainly tortious, such as a sexual contact with an unconsenting minor child or even a crime of sexual misconduct. Cases such as *Schmidt v. Bishop,* 779 *F.Supp.* 321 (S.D.N.Y.1991), are mistaken if they are read to suggest that the First Amendment immunizes pedophiliac conduct by members of religious bodies. Such cases rejected clergy malpractice claims on the basis of free exercise, not because sexual molestation is protected conduct, but because of fear of venturing down a "slippery slope" into questions of liability impossible and unconstitutional to determine. *Schmidt, supra,* 779 *F.Supp.* at 328.

However, there is no slope on which to slip in such cases. Sexual molestation of a minor can never be justified under the Free Exercise Clause. What courts such as *Schmidt* were simply stating was that there was no need to create a new tort to provide a remedy for conduct that was already tortious. "For clergy malpractice to be recognized, the cleric's behavior, even if it is related to [ ] 'professional' duties, must fall outside the scope of other recognized torts." *Strock, supra,* 527 *N.E.*2d at 1239.

Even *Nally v. Grace Community Church of the Valley,* 240 *Cal.Rptr.* 215 (Ct.App.1987), once described as "[t]he most celebrated clergy malpractice case," Arlin M. Adams & Charles J. Emmerich, *A Heritage of Religious Liberty,* 137 *U. Pa. L.Rev.* 1559, 1671 n. 361 (1989), was later reversed by the California Supreme Court. 47 *Cal.*3d 278, 253 *Cal.Rptr.* 97, 763 *P.*2d 948

(1988), *cert. denied,* 490 *U.S.* 1007, 109 *S.Ct.* 1644, 104 *L.Ed.*2d 159 (1989).

> Because of the differing theological views espoused by the myriad of religions in our state and practiced by church members, it would certainly be impractical, and quite possibly unconstitutional, to impose a duty of care on pastoral counselors. Such a duty would necessarily be intertwined with the religious philosophy of the particular denomination or ecclesiastical teachings of the religious entity.
>
> [*Id.* at 299, 253 *Cal.Rptr.* at 109, 763 *P.*2d at 960.]

Of course, there are clerics who wear two hats. To assess the conduct of a cleric moonlighting as a TV repair person establishes no state religion. There are even clerics who are licensed as attorneys, physicians, or psychological therapists. Of course, should clerics hold themselves out as recognized members of other professions, they would be liable if they fail to meet the standards of that profession. In *Dausch v. Rykse,* 52 *F.*3d 1425, 1428 n. 3 (7th Cir.1994), the defendant represented to the plaintiff that he was a capable, trained professional on whom she could rely to assist her with her personal problems and could provide "secular psychological, *not religious,* counseling" (emphasis added). He demanded compensation for his services in the form of sexual favors. Such a person having doffed the robe of cleric may be held to the standards assumed, although not on the basis of the creation of a tort of clergy malpractice.[1]

There is absolutely no suggestion of such an assumption of secular duties in this case. Plaintiff's complaint is explicit that Rector MacDonell failed to exercise that degree of skill, care, and diligence that is exercised by pastoral care providers. Pastoral care provider can only mean one thing. Some jurisdictions have attempted to characterize the tort of clergy malpractice as an action for breach of a fiduciary relationship. The allegation of a

---

[1] The Illinois and Delaware Legislatures have specifically exempted clergy from the provisions of its laws regulating the conduct of therapists. *See Ill.Ann.Stat.* ch. 740, para. 140/1(e) (Smith–Hurd 1997) (excluding from liability "counseling of a spiritual or religious nature" from Sexual Exploitation in Psychotherapy Act); *Del.Code Ann.* Tit. 24, § 3004(3) (1996) (stating professional counselor regulations are inapplicable to "any person ... engaged in religious activity of any nature whatsoever").

breach of fiduciary duty, however, is "simply an elliptical way to state a clergy malpractice claim." *Dausch, supra,* 52 *F.*3d at 1428. Plaintiff's third count for breach of fiduciary duty is explicit that it is only in Reverend MacDonell's capacity "as pastoral care provider and pastoral counselor to her" that he breached any fiduciary duty. The authorities cited by the Court, *ante* at 563–64, 696 *A.*2d at 703–04 concern the law of wills, trusts, and property. *See Gray v. Ward,* 929 *S.W.*2d 774, 1996 WL 364794 at *8 (Mo.Ct.App.1996) (holding that to establish a fiduciary relationship under Restatement of Torts and Missouri law, it must be shown that "[the cleric] possessed or managed things of value"). Absent such interests,

> analyzing and defining the scope of fiduciary duty owed persons by their clergy (assuming pastoral relationships were "fiduciary") would require courts to define and express the standard of care followed by reasonable clergy of the particular faith involved, which in turn would require the Court and the jury to consider the fundamental perspective and approach to counseling inherent in the beliefs and practices of that denomination. This is as unconstitutional as it is impossible. It fosters excessive entanglement with religion.
>
> [*H.R.B. v. J.L.G.,* 913 *S.W.*2d 92, 98 (Mo.Ct.App.1995).]

If there is some general duty on the part of all fiduciaries to refrain from sexual conduct with a client, I assume that trust officers, investment advisors, and real estate agents will be covered by the Court's strictures.

In previous times, secular leaders exercised temporal power by divine right. Secular leaders had to be reminded not to exceed their authority. John Witte, Jr., *A New Concordance of Discordant Canons: Harold J. Berman on Law and Religion,* 42 *Emory L.J.* 523, 531 (1993) (referring to Pope Gelasius' description of the two swords of authority, one spiritual and one temporal). In contrast, in this age and in this country secular leaders exercise temporal power by consent of the governed. The founders of our republic were profoundly influenced by the religious conflicts that occurred in the wake of the Reformation. Adams & Emmerich, *supra,* 137 *U. Pa. L. Rev.* at 1561. They inherited the view that God had instituted two kingdoms, the heavenly one in which the church exercised its spiritual authority and an earthly one in

which the civil magistrates exercised temporal authority and were deeply reluctant to allow one to interfere with the other. "From Roger Williams ... the Founders learned that state control of religion corrupted faith." *Id.* at 1562.

The long journey toward Roger Williams' dream of two states in America, one secular and one spiritual, has foundered on the shores of behavior so incorrect as to cause the Court to lose its bearings. The Court is not alone in its search for standards for sexual conduct. In this nation we are currently debating the proper scope of inquiry into sexual conduct by public officials. Thomas L. Friedman, Domestic Affairs, *New York Times,* Op. Ed. June 12, 1997; *see also* Editorial, The Other Woman, 148 *N.J.L.J.* 1170 (June 16, 1997). For this Court now to impose a civil sanction based on violation of the precepts of the Episcopal religion would transgress the principles upon which our nation is founded. Today the Court creates a tort out of a breach of the tenets of one religion—tenets with which there is almost universal agreement. In a future time, breach of the tenets of another religion not so universally accepted might give rise to another type of tort—a result not contemplated by the constitutional framers.

Plaintiff's counsel stated at oral argument before the trial court that plaintiff wished only to pursue claims that were "universally condemned by society."[2] In this state, if a person knowingly commits a sexual act with a person incapable of giving consent, that conduct constitutes a crime. *N.J.S.A.* 2C:14–2 a(5)(b). In her brief, plaintiff argues that by reason of her condition, she was legally unable to give consent to sexual relations. Plaintiff is free to pursue a remedy in the civil courts of New Jersey for such a transgression of law. She has, however, cast her complaint in a different light.[3] Absent an amendment to assert a claim of

---

[2] The transcript reads "unilaterally" condemned but "universally" was the undoubted meaning.

[3] The caption of this case belies the Court's assumption that the complaint is based on secular activities. The complaint is against "Reverend Alex MacDonell

criminal or illegal sexual conduct, there is no official state religion in New Jersey that makes Pastor MacDonell's conduct a tort.

For substantially the same reasons, plaintiff's complaint against Reverend Fletcher Harper for breach of a pastoral fiduciary duty should be dismissed. I surmise that the Court is temporizing by remanding the matter for further proceedings that can have but one result. *See Hester, supra,* 723 *S.W.2d* at 553 (holding that to adjudicate claim that divulging confidential communications to church members breached fiduciary duty would force court to judge "the competence, training, methods and content of the pastoral function").

To sum up, the First Amendment offers no defense to sexual crimes or abuse. Conversely, no principle of general civil law makes it a tort for competent adults to engage in consensual sexual conduct. The Court makes the pastor's conduct a tort because he is a cleric. Whatever we may think of the morality of the acts involved, a breach of the tenets of the Episcopal religion by one party to a relationship does not give rise to a tort action. To base a tort action on a breach of religious doctrine constitutes an establishment of religion in violation of the First Amendment.

Justice GARIBALDI joins in this opinion.

*For affirmance in part; reversal in part; For remandment—* Chief Justice PORITZ, and Justices HANDLER, POLLOCK, STEIN and COLEMAN—5.

*For dissenting—*Justices O'HERN and GARIBALDI—2.

---

in his capacity as former Rector." In light of its disposition, I must assume that the Court intends such references to be deleted in the later proceedings as well as any references to the deposition of the Episcopal Bishop or the tenets of the Episcopal Church.