**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3341-18T3

ESTATE OF BARRY GIMELSTOB
and FBR FINANCIAL CORP.,

      Plaintiffs-Appellants/
      Cross-Respondents,

v.

HOLMDEL FINANCIAL
SERVICES INC., CHRISTOPHER
W. NALBANDIAN, MICHAEL
J. FRENVILLE, and RED ROCK
INSURANCE ASSOCIATES, LLC,

      Defendants-Respondents/
      Cross-Appellants,

and

LIFEMARK PARTNERS, INC.,

      Defendant.

_____

Argued December 14, 2020 - Decided  January 4, 2021

Before Judges Fasciale and Mayer

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-1863-15.

Charles X. Gormally argued the cause for appellants/cross-respondents (Brach Eichler LLC, attorneys; Charles X. Gormally and Stuart J. Polkowitz, of counsel and on the brief; Edward A. Velky, on the briefs).

Sean F. Byrnes argued the cause for respondents/cross-appellants (Byrnes, O'Hern & Heugle, LLC, attorneys; Sean F. Byrnes and Tyler A. Diekhaus, on the briefs).

PER CURIAM

This case involves a commission dispute between life insurance producers. The Estate of Barry Gimelstob (Gimelstob) and FBR Financial Corp. (FBR) (collectively plaintiffs) appeal from a February 22, 2019 judgment entered after a bench trial, which awarded money damages in plaintiffs' favor against defendants Holmdel Financial Services, Inc. (Holmdel) and Red Rock Insurance Associates, LLC (Red Rock), but dismissed plaintiffs' claims against defendants Christopher W. Nalbandian (Nalbandian) and Michael J. Frenville (Frenville) (the individual defendants). Plaintiffs maintain the individual defendants are personally liable. Defendants cross-appeal from the same judgment and contend the evidence did not support an award of damages to plaintiffs on the life insurance policy purchased by S.P.; and the trial judge erred by not granting defendants damages, or offsetting plaintiffs' damage award, or

awarding a recoupment, to account for Gimelstob's having purportedly breached the contract by engaging in rebating and by failing to cooperate in the purchase of three insurance policies on his life.

We affirm the appeal and cross-appeal.

## I.

Gimelstob was licensed by the State of New Jersey to sell insurance. He began working in the life insurance industry in 1971, opened his first agency in the 1970s or early 1980s, and later founded additional agencies, including FBR. Gimelstob served as a general agent for multiple insurance companies, to which he directly submitted applications for insurance on behalf of his clients. When he did not serve as a general agent for a particular insurance company, he submitted applications through another general agency. Nalbandian and Frenville were licensed insurance producers and co-owners of Holmdel, a general agency, and Red Rock, a retail agency.

As early as 2000, the parties began doing business with each other without a written contract. Gimelstob had significantly more experience in the life insurance industry than did defendants. Nevertheless, Gimelstob had many wealthy clients who needed significant amounts of insurance, and it was particularly helpful to those clients that Nalbandian was a CPA. It was also

3

helpful to Gimelstob's older clients that defendants had significant experience in medical underwriting. Gimelstob submitted a large volume of life insurance applications through Holmdel, consisting of fifty-to-sixty percent of Holmdel's business. Holmdel shared a larger percentage of commissions with Gimelstob than with other producers.

Frenville acted as plaintiffs' principal contact at Holmdel, and he was often invited to meet with Gimelstob's clients. While Gimelstob stated that he had a good relationship with Frenville, Frenville described Gimelstob as challenging, aggressive, and overly demanding, with unrealistic expectations about what could be accomplished.

The October 29, 2013 Contract

On October 29, 2013, Holmdel, FBR, and Gimelstob entered into a written contract, effective January 1, 2012, with a termination date of June 30, 2015. The parties were represented by counsel. Nalbandian signed the contract on behalf of Holmdel. Neither Nalbandian nor Frenville signed the agreement in their individual capacity.

Paragraph seven of the contract addressed the parties' rights to terminate the agreement, including for dishonest or fraudulent acts, indictment or

conviction for violations of federal or state laws or regulations relating to the insurance or securities industry, or breach of the agreement.

<u>Exclusivity, Commissions, and Accountings</u>

Under paragraph two of the agreement, plaintiffs agreed to place their life insurance sales exclusively through Holmdel, with the exception of policies issued by certain enumerated insurers with whom Gimelstob had general agency agreements. In exchange, Holmdel agreed to pay plaintiffs commissions as to these sales.[1]

The agreement further provided that Holmdel was obligated to provide plaintiffs with two separate accountings, along with payment of the amounts determined to be owed: (1) for the period between January 1, 2010 and December 31, 2012; and (2) for the period between January 1, 2013 and July 31, 2013.

Frenville testified that in January 2014, he provided Gimelstob with a single accounting, for the period through October 2013, along with a check for $243,715.56 in commissions. He testified that the accounting was similar to other commission statements he periodically provided to Gimelstob. However,

---

[1] Because these policies were placed through Holmdel, all correspondence from the insurance companies flowed through Holmdel.

he admitted that the accounting addressed only those policies on which defendants believed they owed plaintiffs money, and not all the policies Gimelstob placed with them.

Plaintiffs denied that Holmdel produced the accountings mandated by the agreement. Gimelstob and other FBR witnesses admitted receiving the check for $243,715.56. However, they denied the check was accompanied by any documentation, and stated that, as a result, they were unable to reconcile what policies the check related to.

Gimelstob and other FBR witnesses testified that, as a general matter, commission payments from Holmdel were not accompanied by any supporting documentation or were accompanied with insufficient documentation. This was a constant source of frustration throughout the business relationship because it made it difficult for plaintiffs to reconcile the amounts paid with the commissions owed.

Roy Kvalo, plaintiffs' forensic accounting expert, testified that under the commission schedule set forth in the parties' agreement, defendants underpaid plaintiffs' commissions in the amount of $2,348,976.10 and owed interest in the amount of $328,062.

## Insurance Policies on Gimelstob's Life

The parties' agreement also required the purchase of three insurance policies on Gimelstob's life:  two policies to be purchased by Holmdel, and a third policy to be purchased by Gimelstob.

Specifically, paragraph 5(h) of the agreement provided that Holmdel would purchase and pay the premiums for two term life insurance policies on Gimelstob's life:  one for $3,000,000; and a second for $1,500,000.  Barry Gimelstob would designate the owners and beneficiaries of the $3,000,000 policy, and Holmdel would own the $1,500,000 policy and designate its beneficiaries.  Gimelstob's authorization for these policies would "survive the termination of th[e] Agreement."  Finally, paragraph 5(h) provided:

> Holmdel has agreed to make these premium payments relying upon the provision in paragraph 3e, which relieves Holmdel of its obligation to make any further payments of services fees and renewal overrides to FBR once the proceeds of this policy have been paid.

At paragraph 6(h) of the agreement, FBR agreed to pay for a $1,500,000 permanent life insurance policy on the life of Gimelstob, so long as he was living.  Gimelstob's authorization for this policy, and FBR's obligation to pay for it, would survive termination of the Agreement.  If FBR failed to pay the premiums, Holmdel would "have the right to pay said premiums and offset

7

commissions owed to FBR against any premium that FBR fails to pay. Such payment or premiums by Holmdel will not waive any rights Holmdel may have under this Agreement." The owner and designated beneficiaries of this policy were to be Holmdel or persons, entities, or trusts designated by Holmdel. Paragraph 6(h) also stated: "This policy of insurance is specifically being purchased for Holmdel's benefit with FBR's consent and agreement to fully pay all premiums on this policy in exchange for Holmdel's agreement to grant to FBR the service fees provided for in Section 3(d)."

Finally, as referenced above, at paragraphs 3(d) and 3(e) of the agreement, the parties explained the consideration exchanged for the insurance policies as follows:

> d. In exchange for Barry Gimelstob's allowing Holmdel to purchase a one million five hundred thousand dollar ($1,500,000) policy of life insurance on his life under 5(h) and FBR's contributions to the agreed purchase of and continued payment of life insurance premiums on the one million five hundred thousand dollar ($1,500,000) policy of life insurance on the life of Barry Gimelstob provided for in paragraph 6(h) herein, Holmdel agrees that for all sales by FBR of life insurance policies since January 1, 2006, Holmdel will pay the first one percent (1.0%) of service fees received by Holmdel from any Current Carriers for such policies.
>
> e. In exchange for Holmdel's purchase of the three million dollar ($3,000,000) policy of insurance

provided for in paragraph 5(h) and Holmdel's payment of premiums thereunder, FBR agrees that upon payment of the proceeds of said policy, Holmdel shall have no further obligation under this Agreement or any prior agreements to continue paying service fees or renewal overrides (renewal commissions payable under the Carrier and Commissions Addendum less any direct renewal commission payments from Current and New Carriers). However, it remains the intent of the parties that so long as Barry Gimelstob is living, Holmdel's obligation to pay service fees and renewal overrides shall remain in effect and nothing herein diminishes or restricts FBR's right to continue to receive such payments.

Frenville testified that the paragraph 5(h) $1.5 million term life insurance policy to be paid for by Holmdel was viewed by defendants as a "key-person insurance" policy, because if Gimelstob were to die, it would result in a significant loss of revenue for Holmdel. He testified that the paragraph 6(h), $1.5 million policy to be paid for by FBR but owned by Holmdel was in exchange for Holmdel's agreement to pay service fees to Gimelstob, which otherwise would be paid to the general agent. Finally, he testified that the paragraph 5(h) $3 million term policy to be paid for by Holmdel but owned by Gimelstob was meant to be "a buyout of all amounts that might be due to [Gimelstob] or his estate in one clean swoop," including relieving Holmdel of any obligation to pay renewal commissions.

Gimelstob and Holmdel never purchased the three life insurance policies. This resulted in a cost savings to Holmdel, but deprived defendants of the benefit of the bargain, particularly since Gimelstob died during the course of the trial.

Gimelstob cooperated in obtaining the three insurance policies, to the extent that he provided his medical records to Holmdel, which was responsible for purchasing the policies. However, he would not agree to pay the "preferred" rates that Holmdel obtained for him. Gimelstob would only agree to pay rates based upon "super-preferred" status, which Holmdel was unable to obtain for him due to his age and health status. According to Frenville, Gimelstob also continually tried "to renegotiate . . . the terms of the coverage and who was going to pay how much and who was going to pay what and what kind of policy."

Frenville testified that the required insurance policies remained an outstanding issue throughout the term of the contract. However, it was undisputed that no application was ever presented for Gimelstob to review and sign. At most, Frenville produced an offer for coverage based upon a preferred status rating. Defendants also never declared Gimelstob's refusal to proceed with the insurance policies to be a breach of the parties' agreement, and never threatened to terminate the contract on that basis. The parties continued to do business notwithstanding the failure to purchase the policies.

10

Finally, at trial, defendants did not produce a copy of the offer for coverage that Frenville said he provided to Gimelstob, with Frenville testifying that the illustration documents no longer existed. However, Frenville testified to his recollection of the cost of the policies using a preferred status rating: the annual premium on the $1.5 million term policy would be approximately $18,900; the annual premium on the $3 million policy would be roughly $37,800; and the annual premium for the $1.5 million universal life policy would be about $46,100. Frenville did not know the cost of the policies using a super-preferred status.

### The S.P. Policy and the Question of Rebating

In furtherance of his insurance business, and seeking to serve high net-worth individuals, Gimelstob cultivated a relationship with representatives from J.P. Morgan Chase (JP Morgan). In early 2014, these representatives asked Gimelstob to review and evaluate the life insurance policies owned by one of their clients, S.P. and design a more suitable program for her, consistent with her financial and estate planning goals.

Over the course of about eight months, between March and November 2014, the parties performed a great deal of work to consummate the transaction, which involved converting a whole life insurance policy with a significant cash

value to a policy with a guaranteed death benefit. It was the largest transaction in the history of the parties' relationship. For the most part, the parties performed their normal roles in furtherance of the S.P. policy. Frenville submitted the application with him signing as the agent, rather than Gimelstob.

According to plaintiffs, Frenville signed and submitted the application himself due to: (1) Gimelstob's concerns that Frenville had not submitted all of S.P.'s medical information to the issuing insurance company, Transamerica; and (2) timing concerns in finalizing the policy, relating to the risk that the cost of the policy would increase as a result of fluctuations in the market for Treasury bills. According to plaintiffs, Gimelstob discussed these issues with Frenville, and Frenville responded that he would sign the application if Gimelstob was uncomfortable with how he was handling the case, and he would still pay Gimelstob the entire commission.

Frenville admitted that Gimelstob refused to sign the application due to concerns that Transamerica had not reviewed one of S.P.'s medical reports. However, Frenville did not share Gimelstob's concern. He told Gimelstob that Transamerica had not requested the records, and therefore believed he did not need to provide them.

A-3341-18T3

Gimelstob provided an application to Frenville, which S.P. and her trustee signed. Frenville then signed the application as the agent through Red Rock, his retail agency, as Gimelstob had agreed to. Frenville did not tell Gimelstob that he would not receive a commission if he did not sign the application, and in the past Frenville had signed applications instead of Gimelstob without it affecting the commission paid.

Frenville admitted that the medical records issue strained his relationship with Gimelstob. Frenville highlighted that during a meeting with one of the J.P. Morgan representatives, Gimelstob discussed the possibility of issuing a rebate on S.P.'s policy, since the total cost of the premium over the course of the contract had increased by hundreds of thousands of dollars due to market fluctuations, and the policy would be issued in Florida, where rebating was permitted. According to Frenville, prior to that meeting, he had told Gimelstob on multiple occasions that rebating would not be permitted by Florida law, and in any event, rebating was prohibited by Transamerica, the carrier with whom they were dealing. Rebating also violated the parties' contract, under which FBR agreed to comply with all federal, state, and local laws, rules, and regulations of any applicable regulatory authority.

Notwithstanding this issue, defendants decided not to terminate the contract with plaintiffs. Frenville testified that, at Gimelstob's request, he smoothed things over with the JP Morgan representatives, who expressed disappointment and concern that the topic of rebating had been raised and noted their fiduciary duty to discuss the issue with their client.

Plaintiffs disputed this version of events. They maintained that it was Frenville who raised the issue of rebating and provided Gimelstob with the Florida statute on the issue. Plaintiffs' witnesses testified that Gimelstob provided this information to S.P.'s trustee at JP Morgan, who rejected it out-of-hand, but was not angry or put off. After the S.P. matter, Gimelstob continued to work with JP Morgan and several of S.P.'s family members.

Regarding rebating more generally, Frenville testified that the S.P. matter was the only one in which the issue of rebating was raised. He had no concern about Gimelstob offering rebates as a general matter. Nevertheless, at trial, based upon documents plaintiffs produced in discovery, defendants alleged that Gimelstob regularly engaged in rebating, and disguised his rebating through payments to counsel and direct payments to insurance companies, allegedly on behalf of clients. Defendants made some insurance companies aware of this

14

conduct, and in 2018 Brighthouse Financial terminated its relationship with Gimelstob.

Gimelstob denied that he ever engaged in rebating. He stated that many of his clients were wealthy and had complicated financial portfolios. Therefore, his clients often required legal advice regarding tax and estate issues. He stated that the payments were not disguised rebates, but payments made to counsel on behalf of clients for services rendered. Furthermore, the payments he made to insurance companies on behalf of clients were merely a courtesy, in cases where clients mistakenly submitted premium payments to him instead of the insurance companies.

Ultimately, Transamerica issued a $30,000,000 policy to S.P., with an effective date of September 13, 2014. S.P. paid a first-year premium of $12,302,471. Under the commission schedule set forth in the agreement, plaintiffs were entitled to a commission of $1,554,797.97 on the S.P. policy, but were paid only $687,947.11.[2] Thus, plaintiffs maintained that $866,850.86 was due and owing.

---

[2] At Frenville's request, Gimelstob did not deposit the check until February 2015. Frenville explained that defendants were in the process of purchasing a building and pending that transaction they wanted the money to remain in their account.

A-3341-18T3

According to plaintiffs, at the time of the $687,947.11 payment, Frenville promised to pay the remainder of the commission. Frenville denied this. He testified that he told Gimelstob they needed to discuss the remainder of his compensation on the case.

At trial, defendants maintained that the S.P. policy was outside the terms of the agreement because of the amount of work defendants performed on the case, and because Frenville ultimately signed the application, in part, due to Gimelstob's having raised the issue of rebating.

Gimelstob continued to provide work to Holmdel notwithstanding the parties' ongoing disagreement about the appropriate commission to be paid on the S.P. policy. However, Holmdel no longer paid commissions to Gimelstob. As far as Frenville knew, no steps were taken to reserve money to compensate Gimelstob for any money he might be owed. Ultimately, defendants decided to terminate their relationship with plaintiffs at the conclusion of the contract.

In July 2015, plaintiffs filed their complaint against Holmdel, Nalbandian, Frenville, and Lifemark Partners, Inc. (Lifemark). They filed a first amended complaint in February 2017, and a second amended complaint on May 2017. In their second amended complaint, plaintiffs added Red Rock as a defendant, and they asserted claims for breach of contract, breach of the implied covenant of

good faith and fair dealing, conversion, unjust enrichment, fraud, and breach of fiduciary duty and the duty of loyalty. They also demanded imposition of a constructive trust on defendants' assets and sought an accounting and injunctive relief.

Defendants filed answers to the complaints, denying liability and asserting defenses and counterclaims. In their counterclaims, defendants demanded damages relating to the sale of life insurance to S.P.; alleged Gimelstob breached the parties' agreement and the covenant of good faith and fair dealing by failing to cooperate in the purchase of insurance on his life; and sought a declaration that they had no further obligation to pay to plaintiffs service fees or renewal commissions for any life insurance policies written with Holmdel since 2006.

In July 2018, the trial judge granted defendants' motion for summary judgment in part, dismissing plaintiffs' claims seeking a constructive trust and injunctive relief. In August 2018, the parties stipulated to the dismissal of all claims against Lifemark.

The trial judge conducted the bench trial between October 16 and November 29, 2018. Gimelstob died prior to his scheduled testimony. The trial judge therefore admitted into evidence portions of his deposition testimony and interrogatory answers.

At the close of plaintiffs' case, defendants moved for judgment as to the claims asserted against the individual defendants. The trial judge initially dismissed the fraud claim, but later granted plaintiffs' motion for reconsideration because she had not yet considered Gimelstob's testimony.

On February 22, 2019, the trial judge issued a written opinion and entered final judgment in favor of plaintiffs in the amount of $2,348,976.10: $1,661,029.10 against Holmdel; and $687,947 against Holmdel and Red Rock, jointly and severally. The trial judge dismissed all claims against Nalbandian and Frenville in their individual capacity.

On March 6, 2019, the trial judge held a conference with the parties, at which plaintiffs sought clarification as to their ability to pursue a piercing the corporate veil claim in post-judgment enforcement proceedings. The trial judge stated that her written opinion sufficiently addressed the claim, and she would not address post-judgment enforcement issues.

On appeal, plaintiffs raise the following arguments for this court's consideration:

POINT I

THE TRIAL [JUDGE] ERRED BY FAILING TO IMPUTE PERSONAL LIABILITY AND FIDUCIARY OBLIGATIONS UPON NALBANDIAN AND FRENVILLE IN ACCORDANCE WITH

DEPARTMENT OF BANKING AND INSURANCE'S REGULATORY SCHEME AND PURSUANT TO COMMON LAW[.]

    A. The Regulation of Insurance Producers in Accordance with Title 17 and the Administrative Code[.]

    B. The Code Permits the Imputation of Personal Liability as to Nalbandian and Frenville[.]

    C. Pursuant to the Code, Nalbandian and Frenville Owed Plaintiffs a Fiduciary Duty [W]hich Was Breached[.]

    D. The Trial [Judge] Not Only Misconstrued the Department of Banking and Insurance's Regulatory Scheme Which Imputes Personal Liability to Nalbandian and Frenville, but Ignored the Substantial Evidence Conferring a Fiduciary Duty Upon Nalbandian and Frenville at Common Law[.]

POINT II

THE [TRIAL JUDGE] FAILED TO CLARIFY THAT [HER] JUDGMENT DID NOT DISCHARGE ANY PERSONAL LIABILITY OF NALBANDIAN AND FRENVILLE ARISING FROM THE PIERCING OF HOLMDEL'S CORPORATE VEIL[.]

POINT III

THE [TRIAL JUDGE] ERRED BY FAILING TO HONOR THAT NALBANDIAN AND FRENVILLE WERE PERSONALLY LIABLE FOR THE COMMISSION OF FRAUD AS IT IGNORED THE SUBSTANTIAL WEIGHT OF THE EVIDENCE[.]

A-3341-18T3

A. The Record Before the Trial [Judge] Demonstrates Nalbandian's and Frenville's Commission of Common Law Fraud, [W]hich the [Trial Judge] Completely Ignored and Failed to Analyze[.]

B. The Record Before the Trial [Judge] Demonstrates Nalbandian and Frenville's Engagement of Equitable Fraud, [W]hich the [Trial Judge] Completely Ignored and Failed to Analyze[.]

POINT IV

THE [JUDGE] ERRED BY FAILING TO CONSIDER SUBSTANTIAL AND CREDIBLE EVIDENCE, AND MISAPPLIED THE LAW THAT DEMONSTRATES THAT NALBANDIAN AND FRENVILLE ARE PERSONALLY LIABLE FOR UNJUST ENRICHMENT[.]

A. Law of Conversion[.]

B. The Trial [Judge] Ignored Nalbandian's and Frenville's Ownership Interest in Holmdel and Their Respective Actions with Regard to Monies Due and Owed [to] Plaintiffs, [W]hich Evidences Their Commission of Conversion[.]

POINT V

THE [TRIAL JUDGE] ERRED BY FAILING TO CONSIDER SUBSTANTIAL AND CREDIBLE EVIDENCE, AND MISAPPLIED THE LAW THAT DEMONSTRATES THAT NALBANDIAN AND

20

FRENVILLE ARE PERSONALLY LIABLE FOR UNJUST ENRICHMENT[.]

A. The Trial [Judge] Failed to Properly Weigh the Overwhelming Evidence Before it and Improperly Concluded that the Parties' Relationship Was Only Derived from Contract[.]

On cross-appeal, defendants raise the following arguments for this court's consideration:

POINT I

DEFENDANTS' CROSS-APPEAL SHOULD BE GRANTED IN ITS ENTIRETY[.]

A. The Trial [Judge] Committed Reversible Error When [She] Failed to Award Damages, Measured by the Face Value of the Life Insurance Policies Required by the Agreement to be Purchased For Defendants' Benefit, Given The Plaintiff Gimelstob's Admissions that He Failed To Sign an Application And Submit Himself For The Policies Required by the Agreement.

B. The Trial [Judge] Committed Reversible Error When [She] Dismissed Defendants' Claim for a Setoff Or Recoupment, Measured by the Face Value of the Life Insurance Policies Required by the Agreement, Against Any Judgment Awarded to Plaintiffs Based On Plaintiff's Admissions That He Failed to Sign an Application and Submit Himself for the Policies Required by the Agreement.

21

C. The Trial [Judge] Committed Reversible Error When [She] Awarded Plaintiffs Damages Arising from Breaches of the Agreement Despite the Clear Proof Of Rebating by the Plaintiffs in Violation of New Jersey Law, the Policies of the Insurance Carriers Underwriting and Insurance Policies, and the Terms of the Agreement.

D. The Trial [Judge] Committed Reversible Error When [She] Awarded Damages to Plaintiffs, Inclusive of a Commission on the S.P. Life Insurance Policy, Despite the Presentation of Proof that the Plaintiffs Had Offered a Rebate to the Trustee Purchasing The Policy on Behalf of the Insured as well as the Presentation of Proofs of Rampant Rebating by the Plaintiffs.

E. The Trial [Judge] Committed Reversible Error When [She] Awarded Damages to Plaintiffs, Inclusive of a Commission on the S.P. Life Insurance Policy, under the Terms of the Agreement When Factors such as the Unique Nature of this Application and Work Done by Plaintiffs, and the Refusal of Mr. Gimelstob to Sign as the Producer for the S.P. Policy, Placed it Clearly Outside the Agreement's Terms.

II.

We begin by addressing whether the judge erred in dismissing plaintiffs' claims against Nalbandian and Frenville in their individual capacities.

22

We will not disturb a trial judge's factual findings unless they are so manifestly unsupported by the competent, relevant evidence that affirmance would constitute an injustice. Allstate Ins. Co. v. Northfield Med. Ctr., 228 N.J. 596, 619 (2017). We are particularly deferential to the trial judge's assessment of witnesses' credibility because the judge was able to observe the witnesses as they testified. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). We review questions of law de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

A. Breach of Fiduciary Duty

Plaintiffs appeal from the judge's dismissal of their breach of fiduciary duty claim against Nalbanian and Frenville in their individual capacities.

The trial judge rejected the breach of fiduciary duty claim, reasoning that plaintiffs erred in relying upon N.J.A.C. 11:17A-4.10, which provides that "[a]n insurance producer acts in a fiduciary capacity in the conduct of his or her insurance business," and N.J.A.C. 11:17A-1.6(c), which provides that "[l]icensed partners, officers and directors, and all owners with an ownership interest of [ten] percent or more in the organization shall be held responsible for all insurance related conduct of the organization licensee, any of its branch offices, its other licensed officers or partners, and its employees," because the

New Jersey Insurance Producer Licensing Act, N.J.S.A. 17:22A-26 to -57, and the regulations promulgated thereunder, were intended to protect "consumers of insurance, i.e., insureds, and not . . . sophisticated insurance producers such as [p]laintiffs." The trial judge also found that the claim lacked merit under the common law because the parties' relationship was contractual in nature and defendants did not dominate or control plaintiffs. The trial judge's ruling is supported by both the law and the facts.

As to the statutorily imposed fiduciary duty, it is clear that in both structure and substance the regulations are intended to protect insurance consumers. Our Court has recognized that insurance brokers owe duties to their clients, given the brokers' special knowledge and expertise. See Aden v. Fortsh, 169 N.J. 64, 78-79 (2001) (explaining that insurance intermediaries must act in a fiduciary capacity because of "the increasing complexity of the insurance industry and the specialized knowledge required to understand all of its intricacies"). As such, the judge properly concluded that plaintiff's reliance on N.J.A.C. 11:17A-4.10 and N.J.A.C. 11:17A-1.6(c) to substantiate their breach of fiduciary duty claim was misplaced.

The judge's conclusion that plaintiffs did not establish the existence of a common law fiduciary duty is also well-supported. "The essence of a fiduciary

relationship is that one party places trust and confidence in another who is in a dominant or superior position. A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship." See F.G. v. MacDonnell, 150 N.J. 550, 563 (1997) (recognizing the fiduciary relationship between a parishioner and pastoral counselor).

Here, the parties were sophisticated, licensed insurance producers with significant industry experience. The parties formalized their business relationship through a written contract while represented by counsel. To recognize such a duty in the context of the parties' business relationship here would be inconsistent with the purpose of imposing fiduciary duties, which is to protect the vulnerable from exploitation and abuse by those in a superior, dominant, or controlling position. See id. at 565. In fact, plaintiffs arguably were in the superior position given that they initiated more than half of defendants' business. As such, the judge properly concluded that no common law fiduciary relationship existed in this context.

### B. Fraud and Piercing the Corporate Veil

Plaintiffs argue the trial judge erred by dismissing their fraud claim against Nalbandian and Frenville, and by not clarifying that her judgment did

not discharge any personal liability of Nalbandian and Frenville arising from the piercing of Holmdel's corporate veil. As to the latter issue, plaintiffs assert that defendants' banking records, which were secured through post-judgment efforts, reflect a post-judgment enforcement issue. Plaintiffs request this court clarify whether they may piece the corporate veil on that evidence in a post-judgment proceeding.

In count five of the second amended complaint, plaintiffs asserted a claim of fraud. Plaintiffs specifically alleged that defendants "misrepresented to the insurer that . . . they were S.P.'s agent in connection with their plan to convert commission payments due to Gimelstob/FBR." In addition, plaintiffs sought to impose individual liability upon Nalbandian and Frenville with respect to the alleged fraud, asserting that they were "entitled to 'pierce the corporate veil' of Holmdel and Red Rock as a result of Nalbandian's and/or Frenville's use of the corporation and limited liability company form to commit a fraud upon the Plaintiffs[.]"

The trial judge found that Gimelstob acquiesced in Frenville's signing S.P.'s insurance application; that no misrepresentations were made to the insurer on the S.P. policy, as commissions were paid on the policy in the normal course; and that the parties' dispute over their share of the S.P. commission was a matter

26                                                                      A-3341-18T3

of contract. Accordingly, in her post-trial opinion, the trial judge rejected the allegations of fraud and the attempt to pierce the corporate veil, finding that the fraud claim had not been pled with particularity and the trial proofs did not support a finding of fraud or for piercing the corporate veil.

As to plaintiffs' ability to bring a piercing the corporate veil claim in post-judgment enforcement proceedings, she responded that her written opinion sufficiently addressed the veil-piercing claim, and she would not address post-judgment enforcement issues.

On appeal, plaintiffs assert that their fraud claim was supported by proof that defendants systematically underpaid commissions and deprived plaintiffs of documentation needed to determine that the commissions had been underpaid, including the accountings required under the parties' contract. However, the fraud claim plaintiffs pled in their second amended complaint related solely to the S.P. policy.

Rule 4:5-8(a) requires that a party plead fraud claims with particularity. Piscitelli v. Classic Residence by Hyatt, 408 N.J. Super. 83, 116 (App. Div. 2009). Additionally, plaintiffs are not permitted to assert new claims on appeal which were not pursued below. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229,

234 (1973). Although we need not address plaintiffs' revised theory of the alleged fraud, we add the following remarks.

The trial judge rejected plaintiffs' interpretation of the evidence. In her post-trial opinion, the trial judge found that defendants often did not provide documentation as to their commission payments to plaintiffs and did not produce the accountings required under the contract. However, she attributed those failures to negligence and under-staffing, not fraud. The trial judge stated that "[d]uring Frenville's testimony, it was clear to [her] that he was often overwhelmed by his responsibilities and needed assistance, especially from a bookkeeper or controller who could better handle the financial records." The trial judge also cited Gimelstob's deposition testimony to the same effect. We see no reason to second-guess the trial judge's interpretation of the factual evidence, as it is supported by the record.

Moreover, the trial judge found that the facts did not support a common law fraud claim, which requires clear and convincing evidence of: (1) a material misrepresentation of fact; (2) defendants' knowledge of the falsity; (2) defendants' intent that plaintiffs rely upon the misrepresentation; (4) plaintiffs' reasonable reliance upon the misrepresentation; and (5) resulting damages. Banco Popular N. Am. v. Gandi, 184 N.J. 161, 172-73 (2005).

The record also does not support a claim of equitable fraud, which differs from legal fraud by eliminating the requirements of knowledge of the falsity and an intention to obtain undue advantage therefrom. Jewish Center of Sussex County v. Whale, 86 N.J. 619, 625 (1981); DepoLink Court Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 336 (App. Div. 2013). The record clearly shows that plaintiffs did not rely upon defendants' representations as to what commissions were owed. To the contrary, the record reflects that plaintiffs had full knowledge of the insurance policies they sold and the commissions owed to them pursuant to those policies, and they were persistent in requesting documentation from defendants so that they could independently verify that the correct amounts had been paid on the accounts payable. Plaintiffs also obtained a contractual commitment that defendants would prepare accountings as well as a concomitant legal remedy for defendants' failure to produce the required accountings. See DepoLink, 430 N.J. Super. at 337 (finding no fraud or equitable fraud where a party "rejected the collection agency's attempts to collect the debt" and "never relied on the truth of any of the statements the collection agency made").

On the veil-piercing claim, plaintiffs argue that they were wrongfully denied discovery regarding defendants' finances, which prevented them from

establishing a basis for piercing the corporate veil of Holmdel and/or Red Rock. Based upon documentation obtained post-judgment, they maintain that veil-piercing is appropriate based upon Nalbandian's having "loot[ed]" and "pilfer[ed]" corporate funds. We see no such issue.

The record reflects that during discovery plaintiffs served multiple subpoenas upon Shore River Community Bank, Shore Community Bank, and other entities, which defendants moved to quash. The subpoenas sought "[c]omplete copies of all statements of account reflecting transactions" of Holmdel and Red Rock "with respect to the period of November 2014 through and including December 2015," as well as the entire file regarding a mortgage and promissory note dated December 2, 2015.

The subpoenas related to the fact that in late 2014, when Frenville provided Gimelstob with partial payment of the commission for the S.P. policy, he asked Gimelstob to not deposit the check immediately, because defendants were purchasing a building and wanted the lender to see a higher balance in their account.

By orders dated April 13, 2017 and April 13, 2018, the trial judge quashed the subpoenas. However, in her April 13, 2017 ruling, the trial judge permitted plaintiffs to seek her permission to serve the subpoenas, upon presentation of

30

evidence reflecting their relevance to the case. Plaintiffs did not pursue that option. In her April 13, 2018 ruling, the trial judge stated that plaintiffs could serve the subpoenas at trial. Again, plaintiffs did not pursue that option.

At trial, plaintiffs did not seek to admit documents or testimony relating to defendants' finances. Plaintiffs also did not call Nalbandian as a witness during their case-in-chief, notwithstanding that they had issued a subpoena for his testimony. During the trial, Nalbandian injured his back and could no longer attend as previously planned. On the final day of the trial, plaintiffs changed course and moved to admit excerpts from Nalbandian's deposition testimony as rebuttal evidence and for an adverse inference based upon his failing to testify. Plaintiffs did not seek a continuance to permit Nalbandian to testify.

The trial judge denied the motion to read in the deposition testimony, finding that plaintiffs' counsel had not provided the defense with notice of intent to call Nalbandian as a rebuttal witness, such that he could have been made available to testify both on direct and cross-examination. The trial judge also declined to continue the trial beyond its scheduled end date. The trial judge reiterated this ruling in the post-trial opinion and explained that the proposed deposition excerpts did not constitute proper rebuttal evidence and denied plaintiffs' request for an adverse inference.

Thereafter, this court denied plaintiffs' motion to supplement the record to include documents obtained during post-judgment discovery. Nevertheless, plaintiffs included the post-judgment subpoena, and they make arguments about what that subpoena allegedly revealed.

Plaintiffs have not demonstrated any abuse of discretion in the trial judge's having quashed the subpoenas for lack of relevance. In re Custodian of Records, Criminal Div. Manager, 214 N.J. 147, 162-63 (2013) (applying abuse of discretion standard of review to quashing subpoena). Nothing in the record suggests that the subpoenas sought information relating to the fraud and veil piercing claims, or that they raised this issue before the trial judge.

Plaintiffs also have not demonstrated any abuse of discretion in the trial judge's refusal to admit Nalbandian's deposition testimony at trial. Rowe v. Bell & Gossett Co., 239 N.J. 531, 551-52 (2019) (applying abuse of discretion standard to evidentiary rulings). Nor have they shown an abuse of discretion in the trial judge's decision to end the trial without a continuance for Nalbandian to testify on rebuttal. State v. Hayes, 205 N.J. 522, 537 (2011) (stating that whether to grant continuance is within trial judge's discretion); see also State v. Jones, 232 N.J. 308, 311 (2018) (noting that "[i]n our judicial system, the trial [judge] controls the flow of proceedings in the courtroom. As a reviewing court,

we apply the abuse of discretion standard when examining the trial [judge's] exercise of that control").

It was plaintiffs' burden to establish a fraud or injustice that supported piercing the corporate veil in order to impose individual liability upon the corporate principals. Richard A. Pulaski Constr. Co. v. Air Frame Hangars, Inc., 195 N.J. 457, 472-73 (2008). They simply did not do so. The record contains no evidence that defendants failed to observe corporate formalities, nor any evidence about the corporate defendants' finances. Verni ex rel. Burstein v. Harry M. Stevens, Inc., 387 N.J. Super 160, 199-200 (App Div. 2006). Furthermore, contrary to plaintiffs' appellate arguments, the record does not support a conclusion that plaintiffs' failure to produce such evidence was the result of either erroneous rulings, or defendants' obstruction or recalcitrance.

## C. Conversion

Plaintiffs contend the trial judge erred by not holding Nalbandian and Frenville liable for conversion for failing to pay the commissions owed to plaintiffs. We disagree.

Conversion is defined as the intentional exercise of dominion or control over another's property, which is inconsistent with the owner's rights. Bondi v. Citigroup, Inc., 423 N.J. Super. 377, 431 (App. Div. 2011). However, "[t]o

avoid transforming a breach of contract into an act of conversion," the money at issue must clearly belong to the injured party, and be identifiable. Id. at 431-32. Thus, a conversion claim will not be sustained in the context of a creditor-debtor relationship, or a dispute about monies owed. Ibid.

Here, there was no specifically identifiable money that allegedly was converted by defendants. Rather, as the trial judge found, the record reflects a creditor-debtor relationship, with a dispute about the amount of money owed within the context of a contractual relationship. Therefore, as the judge determined, the tort of conversion could not apply. Even if it did—which is not the case—there exists no evidence in the record that Nalbandian and Frenville distributed commission money belonging to plaintiffs or directed the conversion of such money. We therefore conclude that the judge properly dismissed plaintiffs' conversion claim.

### D. Unjust Enrichment

Plaintiffs contend the trial judge erred by not holding Nalbandian and Frenville personally liable for unjust enrichment, noting the failure to pay commissions owed, and the alleged fiduciary relationship between the parties.

"To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be

A-3341-18T3

unjust."  VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994).  However, "[u]nder New Jersey law, a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law."  Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 316 (2002).  Accordingly, "[t]he unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights."  VRG, 135 N.J. at 554.  "Because unjust enrichment is an equitable remedy resorted to only when there was no express contract providing for remuneration, a plaintiff may recover on one or the other theory, but not both."  Caputo v. Nice-Pak Prods., Inc., 300 N.J. Super. 498, 507 (App. Div. 1997).

Here the judge correctly found that, as in Saltiel, the parties' relationship was governed by contract, and their disputes over monies owed was governed by the terms of that contract.  The parties' relationship was not a fiduciary one. The individual defendants were not parties to the contract, and plaintiffs may not assert tort claims against the individual defendants to enhance the benefit for which they bargained.  As previously discussed, plaintiffs presented no evidence that Nalbandian or Frenville were unjustly enriched by money owed to

35

plaintiffs by inappropriately taking commission money from the corporate accounts, and the record does not support plaintiffs' argument that their failure of proof was caused by arbitrary, capricious, or unreasonable judicial decisions, or obstruction by defendants. The trial judge properly dismissed the unjust enrichment claims.

### III.

We now turn to defendants' cross-appeal. Defendants argue the trial judge erred by not awarding damages to them, or offsetting plaintiffs' damage award or awarding a recoupment, measured by the face value of the insurance policies on Gimelstob's life that were contractually mandated but not purchased, minus premium adjustments.

Defendants Holmdel, Nalbandian, and Frenville counterclaimed that plaintiffs breached the parties' agreement through Gimelstob's failure to cooperate in the purchase of insurance on his life and that plaintiffs breached the covenant of good faith and fair dealing.

As relief for these causes of action, defendants sought compensatory and consequential damages, attorneys' fees, interest and cost of suit. More specifically, defendants sought a declaration that they had no further obligation to pay service fees to plaintiffs, and no obligation to pay renewal commissions

for any life insurance policies written with Holmdel since 2006.  Defendants also asserted as an affirmative defense that "[d]efendants are entitled to a setoff or to recoup certain damages as a result of the [p]laintiff's conduct and/or breach of contract."

The trial judge set forth comprehensive findings and conclusions as to these issues in her post-trial opinion. First, the trial judge concluded that Gimelstob failed to cooperate in acquiring insurance policies on his life:

> The court is not persuaded that Gimelstob's position regarding his rating was reasonable.  Despite his statement that he might want to apply for other policies in the future, he admitted he had not done so.  It is clear that the permanent policy would have been the most expensive and, by his failure to cooperate, Plaintiffs benefitted financially.  He also stated that it was Defendant's obligation to get the insurance and to get the best rates; however, this obligation to "get the best rates" does not appear in the Agreement, nor does the Agreement require that the insurance policies be issued at "super preferred" or "preferred plus" rates, which Gimelstob admitted in his deposition.

As a result of this breach of contract, the trial judge found that plaintiffs were not entitled to receive service fees, thus granting defendants some of the relief requested.  However, the trial judge found that plaintiffs were still entitled to payment of renewal commissions, notwithstanding Gimelstob's failure to cooperate in the purchase of the life insurance policies, due to a failure of proof

37

on the part of defendants.  The trial judge explained that "[t]he issue of renewal overrides . . . was not addressed by Defendants in their pleadings, at trial or in the post-trial submission," and that although the defendants' counterclaim demanded a declaration that plaintiffs "have no further right to any renewal commissions under any policies written with Holmdel," paragraph 3(e) of the parties' Agreement "distinguishes renewal overrides from renewal commissions directly paid to plaintiffs[.]"

Finally, the trial judge found that the proofs did not support defendants' claim of entitlement to a setoff or recoupment based upon the face value of the policies.  The trial judge found that Gimelstob's obtaining life insurance was not critical to Holmdel's entry into the agreement or remaining in the agreement, and Frenville failed to work out the details of the policies in conjunction with Gimelstob's estate plan.  Additionally, the trial judge found that defendants presented insufficient proof as to the details of the policies proposed to Gimelstob, including copies of the applications and the quoted premiums, such that the trial judge was not equipped to determine a reasonable setoff or recoupment, which would require deducting the cost of the premiums paid from the face value of the policies.

We review the interpretation of a contract de novo. Serico v. Rothberg, 234 N.J. 168, 178 (2018). If the contract terms are clear, this court applies the contract as written, without "rewrit[ing] a contract for the parties better than or different from the one they wrote for themselves." Kieffer v. Best Buy, 205 N.J. 213, 223 (2011).

A breach of contract claim requires proof, by a preponderance of the evidence, that: the parties entered into a valid contract, with certain terms; plaintiff fulfilled its obligations under the contract; defendant failed to perform its obligations under the contract; and plaintiff sustained damages as a result. Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 512 (2019). Regarding damages, "[a] breaching party is 'liable for all of the natural and probable consequences of the breach of [the] contract.'" Id. at 514 (quoting Pickett v. Lloyd's, 131 N.J. 457, 474 (1993)).

As for defendants' request for a setoff, setoff is an equitable right that provides for affirmative recovery on a claim that may be independent of the transaction upon which plaintiffs' claims were based. Miah v. Ahmed, 179 N.J. 511, 527 (2004). By contrast, recoupment is an equitable defense, the purpose of which is to examine the parties' transaction and achieve a just result. Beneficial, 86 N.J. at 609, 612; Gen. Motors Acceptance Corp. v. Dir., Div. of

<u>Taxation</u>, 26 N.J. Tax 93, 99-100 (App. Div. 2011). Recoupment may only be utilized to reduce or extinguish the plaintiff's recovery, whereas setoff may be awarded for any amount to which defendant is entitled. <u>Beneficial</u>, 86 N.J. at 609, 611.

Here, the trial judge fairly determined that Gimelstob breached the contract by failing to cooperate in the purchase of the required life insurance policies. Moreover, the record supports the trial judge's assessment of the appropriate damages for that breach of contract: denial of plaintiffs' requests for service fees, as per the clear contract language regarding the consideration exchanged for the policies, set forth in paragraphs 5(h) and 6(h) of the contract. The trial judge fairly rejected additional damages premised upon renewal overrides, which are also set forth in the contract as consideration for the policies in paragraph 5(h), due to a lack of proof on this element of the breach of contract claim.

The trial judge also rejected defendants' request for a setoff or recoupment premised upon the face value of the policies, minus the premiums that would have been paid for the policies. The trial judge's rejection was based, in large part, upon her rejection of Frenville's testimony about the alleged premiums for

the policies, which prevented her from calculating a fair setoff or recoupment amount. There is no basis to disturb that credibility assessment.

The trial judge also determined that a setoff or recoupment would not be equitable in light of the fact that the insurance policies were not critical to Holmdel's entry into the contract, as evidenced by defendants' failure to work out the details of the policies for Gimelstob's estate plan, and their failure to terminate the agreement based upon Gimelstob's breach in failing to cooperate in the purchase of the policies.

There is no basis for us to disturb the trial judge's assessment of the factual record, or the conclusions it reached as a result, and defendants have not established any basis for appellate intervention.

IV.

Defendants next contend the trial judge erred by awarding plaintiffs damages for breach of contract, including a commission relating to the S.P. policy. They contend such damages should have been denied based upon clear proof that plaintiffs engaged in rebating in violation of New Jersey law, and offered to engage in rebating with respect to the S.P. policy.

In their contract, the parties agreed to comply with all federal, state, and local laws, rules, and regulations of any applicable regulatory authority.

Rebating of insurance premiums is prohibited under N.J.A.C. 11:17A-2.3. The parties' contract also provided a procedure for terminating the agreement based upon specified acts, which included dishonest or fraudulent acts. Defendants never initiated the termination procedures and termination of the agreement would not have negated defendants' obligation to pay commissions to plaintiffs, because the contract stated: "Unless otherwise required by law or pursuant to any general agency agreement, FBR will receive commissions subsequent to termination of this Agreement with respect to insurance policies placed prior to termination of this Agreement, in accordance with the Carrier and Commission Addendum."

In their answer to the second amended complaint, defendants asserted that plaintiffs violated the dishonest or fraudulent acts provision of the contract. They also asserted affirmative defenses to plaintiffs' recovering on their claims, including that plaintiffs breached the agreement and committed unlawful acts. In addition, in their counterclaims, defendants alleged that Gimelstob engaged in "inappropriate dealings" with S.P., and breached the contract, such that defendants handled the S.P. transaction and should receive the entire S.P. commission, and plaintiffs should not be entitled to renewal commissions.

In her post-trial opinion, the trial judge rejected defendants' assertion that Gimelstob engaged in rebating and concluded that any discussion of rebating with respect to the S.P. policy was the fault of both parties. Gimelstob's payments to Brach Eichler were not for illegal rebating, but for "assistance from sophisticated tax and estate planning professionals to service [extremely wealthy clients] properly." Nor was Gimelstob solely responsible for discussions of rebating with JP Morgan, as the trial judge explained that testimony from an FBR employee suggested that "Frenville was pushing [Gimelstob] to speak to JP Morgan about rebating because of the change of premiums for the S.P. policy," and it appeared that it "was discussed between Frenville and Gimelstob, and also with [the JP Morgan representative] to some extent[.]" Based upon these findings, the trial judge dismissed the counterclaim relating to the S.P. policy. We will not second-guess this determination.

V.

Finally, defendants contend the trial judge erred by awarding a full commission to plaintiffs relating to the S.P. policy pursuant to the contract terms. They argue that Gimelstob's refusal to sign the application placed the S.P. policy outside the contract's terms, and the partial commission they paid to

43

plaintiffs was reasonable given the amount of work defendants performed to consummate the transaction.

The contract provided that FBR would be paid premiums for policies sold by FBR through Holmdel. In their answer to the second amended complaint, defendants denied that plaintiffs were entitled to any additional commission on the S.P. policy. In their counterclaims, they asserted that any commission paid to plaintiffs on the S.P. policy should be returned because the policy was not sold by FBR or Gimelstob, and the policy would not have been sold but for the actions of defendants.

The trial judge made extensive findings regarding the work performed on the S.P. policy, and largely accepted plaintiffs' version of events. The trial judge explicitly rejected defendants' allegation that they performed work on the S.P. policy that was in excess of the norm for other policies sold through Gimelstob, defendants' arguments about the significance of Frenville's signing the application, and defendant's allegations with respect to rebating. Thus, the trial judge ordered that plaintiffs were entitled to the full commission on the S.P. policy and dismissed defendants' counterclaims with respect to the S.P. policy. The trial judge's findings are supported by the record, and we see no basis for appellate intervention.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3341-18T3